MILLERS CAPITAL INSURANCE
COMPANY, Appellee

v.

GAMBONE BROTHERS DEVELOP-
MENT CO., INC., Continental Realty
Co., Whitpain Associates, L.P., Mar-
gery and Thomas Caputo

Appeal of Gambone Brothers
Development Co., Inc., and
Whitpain Associates.

Millers Capital Insurance
Company, Appellee

v.

Gambone Brothers Development Com-
pany, Gambone Brothers Construc-
tion Company, Gambone Brothers Or-
ganization, Inc., Gambone Brothers
Enterprises, Inc., Gambone Develop-
ment Company, Gambone Construc-
tion, Continental Realty Company,
Christopher and Amy Coloian, Scott
and Laura Dillman, Mark Levy and
Maureen Fitzgerald and George and
Elizabeth Sees

Appeal of Gambone Brothers
Development Co., Inc., and
Whitpain Associates.

Superior Court of Pennsylvania.

Submitted Oct. 29, 2007.

Filed Dec. 28, 2007.

Reargument Denied March 5, 2008.

Lee M. Epstein, Philadelphia, Frank R. Bartle, Lansdale, and Timothy P. Law, Philadelphia, for appellants.

Stuart D. Lurie, Philadelphia, for appellee.

Charles D. Mandracchia, Skippack, fro Continental, appellee.

Jacob C. Cohn, Philadelphia, for Millers, appellee.

BEFORE: BENDER, McCAFFERY and TAMILIA, JJ.

OPINION BY TAMILIA, J.:

¶ 1 Gambone Brothers Development Co., Inc. (Gambone) and Whitpain Associates [1] appeal from the May 1, 2007, Orders of the trial court denying Gambone's cross-motion for partial summary judgment and, conversely, granting a motion for partial summary judgment and a cross-motion for partial summary judgment filed by appel-

---

**1.** From what we can discern from the certified record, Whitpain Associates is a business entity which is either owned and/or operated and/or controlled by Gambone.

lee, Millers Capital Insurance Company (Millers).

¶ 2 Gambone is a real estate firm headquartered in Montgomery County. The firm plans, develops, and builds housing developments, retail properties, office properties and industrial sites, and also operates a number of residential rental properties throughout the Delaware Valley and the suburban counties contiguous to Philadelphia. During the late 1990's and the earlier part of the current decade, Gambone planned, developed, and built, among other projects, two housing developments. The first came to be known as Normandy at Blue Bell (Normandy); the second as The Reserve at Spring Meadow (The Reserve).

¶ 3 To cover the unforeseen risks and hazards inherent in projects of such scale, Gambone purchased extensive insurance coverage from Millers. Gambone and Millers executed three insurance policies. The first policy, numbered 616739, was a primary package policy (PL policy) that provided both property and liability coverage to Gambone with a coverage period running from June 30, 2002, through June 30, 2003. Record, No. 2, Millers Preliminary Objections to Defendants' Second and Fourth Counterclaims, at B, Exb. C.[2] The second policy, numbered 628468, was an umbrella excess policy Gambone purchased to protect itself from exposure in an amount exceeding the policy limits of any other Miller policy Gambone had, or would, purchase; the coverage period for the excess policy was identical to that of the PL policy-June 30, 2002, through June 30, 2003. Id. at Exb. D. The third and final policy, numbered 648507, was a commercial general liability policy (CGL) with coverage effective from August 8, 2002, through August 8, 2003. Id. at Exb. B.

¶ 4 The matter sub judice is an insurance coverage dispute between Millers and Gambone. The salient issue underlying this appeal is whether Millers owes a duty to indemnify and/or defend Gambone against claims brought by two groups of plaintiffs. Each individual plaintiff previously had purchased a home at either The Reserve or the Normandy development and had suffered damage in their respective homes attributable to faulty workmanship. The damage was discovered during the period in which Gambone was insured under the three policies issued by Millers. The relevant procedural history of this case is intricate given that it involves two underlying sets of claims. We will set forth the relevant factual and procedural history of each set of claims separately before outlining the conjoined factual and procedural history of these cases.

## I. The Coloian Claims

¶ 5 From what we can discern the first group of plaintiffs—Christopher and Amy Coloian, Scott and Laura Dillman, Mark and Maureen Fitzgerald, and George and Elizabeth Sees (collectively referred to hereinafter as the "Coloian plaintiffs")—all of whom owned homes in The Reserve—initiated proceedings in the Chester County Court of Common Pleas by writ of summons dated November 21, 2003. See Gambone brief at 6 n. 1. On December 21, 2004, the Coloian plaintiffs filed an amended complaint in the Chester County Court of Common Pleas averring that in 2001 the

---

2. Very few documents in the certified record are numbered and the docket sheets forwarded to this Court do not contain corresponding entries for various documents contained within the record. In cases with voluminous records, such as this one, it is imperative the

prothonotary comply with Pa.R.A.P.1931, **Transmission of Record,** (c) **Duty of clerk to transmit the record.** We refer the Montgomery County Prothonotary to Rule 1931(c) for future reference.

Coloians, Dillmans, Fitzgeralds, and Sees had each entered into an agreement of sale with Gambone for the purchase of separate residences in The Reserve. Record Part 10 of 17, Action for Declaratory Judgment, Exb. A, at 13–15. The complaint averred that each family began to notice water leaks in their respective homes during the course of 2002. The complaint further averred these leaks were the result of "construction defects and product failures" in, *inter alia,* the homes' vapor barriers, windows, roofs, and stucco exteriors. The complaint raised claims for breach of contract, breach of warranty, negligence, strict liability, fraud and misrepresentation, and violations of the Unfair Trade Practice and Consumer Protection Law (UTPCPL)[3] against Gambone.[4]

¶ 6 By Order dated March 18, 2005, the Chester County Court of Common Pleas sustained, in part, preliminary objections filed by Gambone and dismissed the Coloian plaintiffs' negligence claims. Record Part 10 of 17, Action for Declaratory Judgment, Exb. B. On February 16, 2006, Millers filed a declaratory judgment action in Chester County asking the trial court, *inter alia,* to issue an order declaring Millers had no duty to defend or indemnify Gambone against the surviving claims brought by the Coloian plaintiffs. *Id.*

¶ 7 Shortly thereafter, the parties proceeded to arbitration pursuant to a provision set forth in the underlying agreements of sale; as a result, further judicial proceedings were stayed. *See* Record Part 10 of 17, Millers Motion for Partial Summary Judgment, Exb. D, Preliminary Interim Arbitral Award, at 3, ¶ 5. On April 14, 2006, the arbitrator entered an interim award in favor of the Coloian plaintiffs. *Id.* On that same day, Gambone sent a notice of claim to Millers. *Id.* at Exb. E. By letter dated April 25, 2006, Millers denied coverage. *Id.* On July 13, 2006, the arbitrator entered a final arbitration award in favor of the Coloian plaintiffs in the aggregate amount of $1,146,494.60. *Id.* at Exb. F.

## II. The Caputo Claims

¶ 8 On August 18, 2005, Thomas and Margery Caputo, the second set of plaintiffs, filed a written complaint in the Montgomery County Court of Common Pleas averring that the Caputos had executed an agreement of sale with Gambone in May of 2002 for a residence in the Normandy development. Record, No. 2, *supra* at B, Exb. A. The complaint averred that in late September of 2002, the Caputos discovered Gambone had used defective stucco known as "drivit" in building the exterior of the Caputos' home.[5] The Caputos alleged the defective drivit resulted in "delamination, peeling, disfigurement, compromise of structural integrity, infiltration by the elements, mold, cracking of the exterior cladding, and moisture penetration and entrapment in and through said system." The Caputos further averred that "the defects are the result of poor workmanship during the initial construction of the Home, including, without limitation, the improper or faulty design, implementation, workmanship, and super-

---

3. 73 P.S. § 201–1 *et. seq.*

4. The complaint included similar claims against additional defendants who have no interest in this appeal. Record Part 10 of 17, Action for Declaratory Judgment, Exb. A, at 13–15. Whitpain Associates was not one of the additional defendants named. *Id.*

5. The complaint included similar claims against additional defendants who have no interest in this appeal. Record, No. 2, Millers Preliminary Objections to Defendants' Second and Fourth Counterclaims, at B, Exb. A. Whitpain Associates is a named defendant in the Caputo complaint. *Id.*

vision of the application of the exterior finish of the Home by the Builder." The complaint raised claims for breach of implied warranty, fraudulent nondisclosure, negligent misrepresentation, and violations of the UTPCPL.

¶ 9 On November 3, 2005, Millers filed a complaint seeking, in relevant part, a judgment against Gambone declaring that Millers had no duty to defend or indemnify Gambone against the Caputos' claims. Record Part 8 of 17, Amended Motion to Coordinate Actions, Exb. A.

¶ 10 By Order dated July 26, 2006, the Montgomery County Court of Common Pleas sustained Gambone's previously filed preliminary objections, in part, and dismissed the Caputos' fraudulent nondisclosure, negligent misrepresentation, and UTPCPL claims. Record Part 13 of 17, Gambone Defendants' Motion for Partial Summary Judgment Regarding Insurance Policy Interpretation, Exb. F. As a result, only the Caputos' breach of implied warranty claim survived. *Id.*

### III. Coordination and Summary Judgment

¶ 11 On June 20, 2006, Gambone filed a motion to coordinate the Millers declaratory judgment actions in the Montgomery County Court of Common Pleas by transferring the Coloian declaratory judgment action from Chester County to Montgomery County. *See generally,* Pa.R.C.P. 213.1(d)(2), **Coordination of Actions in Different Counties.** On July 24, 2006, Gambone filed an amended motion to coordinate.

¶ 12 While the amended motion was pending, Millers filed a motion for partial summary judgment in the Coloian proceedings on September 11, 2006, seeking a declaration that Millers was not required to indemnify Gambone for the July 13, 2006, arbitration award pursuant to the

three previously issued insurance policies. By Order dated September 29, 2006, the Montgomery County Court of Common Pleas coordinated the Coloian declaratory judgment action with the Caputo declaratory judgment action by directing the transfer of the former action to Montgomery County.

¶ 13 On November 17, 2006, Gambone filed a cross-motion for partial summary judgment in both the Coloian and Caputo declaratory judgment actions. On December 18, 2006, Millers filed a brief in opposition to Gambone's cross-motion and in support of its pending motion for partial summary judgment in the Coloian declaratory judgment action; the brief also purported to raise a cross-motion for partial summary judgment in the Caputo action.

¶ 14 On March 12, 2007, the trial court held oral argument on all of the outstanding motions and cross-motions for summary judgment. Shortly thereafter, the trial court issued the two Orders subject to appeal declaring Millers has no duty to defend or indemnify Gambone for the Coloian arbitration award, and declaring Millers has no duty to defend or indemnify Gambone against the Caputo action.

¶ 15 Gambone promptly filed a notice of appeal, which subsequently was amended, and complied with the trial court's ensuing Rule 1925(b) Order by filing a timely statement of matters complained of on appeal. *See generally,* Pa.R.A.P.1925, **Opinion in Support of Order.** On June 27, 2007, the trial court issued an Opinion discussing the rationale it relied on in concluding Millers had neither the duty to indemnify Gambone for the arbitration award in Coloian proceedings nor the duty to defend or indemnify Gambone against the Caputos' breach of implied warranty claim. The trial court noted that the insuring agree-

ments for both the PL policy and the CGL policy contained the following language:

1. Insuring Agreement

 a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.

 * * *

 b. This insurance applies to "bodily injury" and "property damage" only if:

 (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory;"

Record, No. 2, *supra* at B, Exb. B, Commercial General Liability Coverage Form, *accord* Exb. C, PL policy.

¶ 16 The trial court further noted the CGL and PL policies define an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *See e.g.,* Record, No. 2, *supra* at B, Exb. B, Sec. V, Definitions, at 22. Relying on this language, the trial court found that our Supreme Court's recent decision in *Kvaerner Metals Division of Kvaerner of United States, Inc. v. Commercial Union Insurance Co., et al.,* 589 Pa. 317, 908 A.2d 888 (2006), was controlling. Trial Court Opinion, Moore, J., at 6. In *Kvaerner,* our Supreme Court held that language in a commercial general liability policy identical

to the language in the CGL and PL policies set forth above was unambiguous and did not provide coverage for claims against the insured which were premised on allegations of faulty workmanship in constructing a coke oven battery. *Id.* at 899.[6]

¶ 17 Gambone raises the following issues for our review:

1. Did the trial court err in decreeing that the allegations in the Underlying Caputo Action and the Underlying Coloian Action did not actually or potentially constitute an "occurrence" as defined in the relevant insurance policies, especially in light of the obligation to resolve any ambiguities in policy language in favor of coverage?

2. Does the continuous or repeated presence of water that has intruded through the stucco exterior of a home causing property damage to non-defective property constitute an "occurrence," which is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions"?

3. Did the trial court err in entering summary judgment when there were factual disputes about the reasonable expectations of the policyholder and the nature and circumstances of the insurance transaction, which included the purchase of insurance at a high premium specifically to insure construction liabilities?

---

**6.** In *Kvaerner Metals Division of Kvaerner of United States, Inc. v. Commercial Union Insurance Co., et al.,* 589 Pa. 317, 908 A.2d 888 (2006), the Court noted that the majority of courts which have considered the question of whether claims premised on allegations of faulty workmanship are covered under occurrence based CGL policies have concluded such claims are not covered. *See e.g., Snyder Heating v. Pa. Manufacturers' Association Insurance Co.,* 715 A.2d 483, 487 (Pa.Super.1998); *Norwalk Ready Mixed Concrete v.*

*Travelers Insurance Cos.,* 246 F.3d 1132, 1137 (8th Cir.2001); *Hotel Roanoke Conference Center Commission v. Cincinnati Insurance Co.,* 303 F.Supp.2d 784, 788 (W.D.Va.2004); *Auto–Owners Insurance Co. v. Home Pride Cos.,* 268 Neb. 528, 684 N.W.2d 571, 578 (2004); *McAllister v. Peerless Insurance Co.,* 124 N.H. 676, 474 A.2d 1033, 1036 (1984); *L–J Inc. v. Bituminous Fire & Marine Insurance Co.,* 366 S.C. 117, 621 S.E.2d 33, 36 (2005).

Did the trial court err in denying summary judgment to the Gambone Defendants in their Motion for Partial Summary Judgment on Policy Interpretation?

Gambone brief at 5.[7]

¶ 18 We begin by delineating our standard and scope of review:

An appellate court may reverse the grant of a motion for summary judgment if there has been an error of law or an abuse of discretion. Since the issue as to whether there are no genuine issues as to any material fact presents a question of law, our standard of review is *de novo;* thus, we need not defer to the determinations made by the lower tribunals. Our scope of review, to the extent necessary to resolve the legal question before us, is plenary. We must view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party.

*Chanceford Aviation Properties., LLP. v. Chanceford Twp. Bd. of Supervisors,* 592 Pa. 100, 107, 923 A.2d 1099, 1103 (2007) (internal citations omitted).

 ¶ 19 The interpretation of an insurance policy is a question of law subject to *de novo* analysis. *Kvaerner, supra* at 897, *citing 401 Fourth St. v. Investors Insurance Group,* 583 Pa. 445, 452–53, 879 A.2d 166, 170 (2005). The primary goal of insurance policy interpretation is to ascertain the intent of the parties as manifested in the words of the policy itself. *Id.* When policy language is unambiguous, we give effect to that language. *Id.* When, on the other hand, policy language is ambiguous, we will construe the language in favor of the insured given that the insurer drafts the policy and controls the scope of coverage. *Id.* It is axiomatic that an insurance provider's duty to indemnify and/or defend a policy holder against a suit brought by a third party is based on a determination as to whether the third party's complaint triggers coverage. *Id.* at 896, *citing Mutual Benefit Insurance Co. v. Haver,* 555 Pa. 534, 537–38, 725 A.2d 743, 745 (1999).

¶ 20 While Gambone raises a number of issues for our consideration, we must also account for the arguments raised by *amicus curiae* United Policyholders (United). Accordingly, we have characterized the various arguments raised for ease of disposition as opposed to analyzing the various arguments using a tedious and disjointed issue by issue approach.

## IV. Latent Ambiguity

¶ 21 As an initial matter, Gambone argues the facts of this case are distinguishable from the facts of *Kvaerner.* Gambone contends this discrepancy creates latent ambiguity in the underlying policies that should be construed against Millers as a matter of law. *See e.g., Steuart v. McChesney,* 498 Pa. 45, 53, 444 A.2d 659, 663 (1982) ("A patent ambiguity is that which appears on the face of the instrument, and arises from the defective, obscure, or insensible language used. Black's Law Dictionary 105 (rev. 4th ed. 1968). In contrast, a latent ambiguity arises from extraneous or collateral facts which make the meaning of a written agreement uncertain although the language thereof, on its face, appears clear and unambiguous."), *citing Easton v.*

7. United Policyholders (United) filed a brief as *amicus curiae* adopting and incorporating by reference Gambone's statement of the questions involved. United Policyholders *amicus curiae* brief at 3. United is a non-profit organization founded in 1991 "dedicated to educating the public on insurance issues and consumer rights." *Id.* at 1.

*Washington County Insurance Co.*, 391 Pa. 28, 137 A.2d 332 (1957); *see also* Black's Law Dictionary 88 (8th ed. 2004).

■ ¶ 22 Specifically, Gambone contends the nature of the damage at issue in this case varies from the nature of the damage at issue to the coke oven battery in *Kvaerner*.[8] Gambone concedes *Kvaerner* stands for the broad principle that an insurance claim under an occurrence based CGL policy that defines the term "occurrence" as an accident cannot be premised on a claim of faulty workmanship. Gambone argues the Coloian and Caputo actions do not merely involve claims for faulty workmanship that led to the failure of the stucco exteriors but also involve claims for ancillary and accidental damage caused by the resulting water leaks to non-defective work inside the home interiors. Gambone brief at 26. Gambone argues the resulting water damage constitutes an "occurrence" even though the damage to the faulty stucco exteriors does not. *Id.* We do not see any merit in the distinction Gambone attempts to create.

¶ 23 In *Kvaerner*, the plaintiff's complaint alleged Kvaerner had built and warranted a defective coke battery. *Id.* at 891. Kvaerner contended the damage complained of had occurred after one of its subcontractors had allowed the roof of the battery to be grouted too early. *Id.* at 892–893. Kvaerner further contended the defective grouting was unable to stand up to unexpected "monsoon rains," which lead to the "longitudinal movement of the roof" and resulted in internal damage to the coke oven battery. *Id.* Kvaerner contended these monsoon rains, and the resulting internal damage to the battery, constituted an "occurrence" for purpose of the underlying CGL policy. *Id.* The Court rejected Kvaerner's rationale.

¶ 24 In the instant matter, the factual sequences underlying the Coloian and Caputo actions are identical. Both complaints aver Gambone and/or its subcontractors built homes with defective stucco exteriors, windows, and other artificial seals intended to protect the home interiors from the elements. Both complaints are based on claims for faulty workmanship. Both complaints allege that when the defects manifested themselves, water damage resulted to the interior of the larger product—in this case, the home interiors.

¶ 25 Furthermore, the weight of common sense collapses the distinction Gambone attempts to create. The *Kvaerner* Court held the terms "occurrence" and "accident" in the CGL policy at issue contemplated a degree of fortuity that does not accompany faulty workmanship. *Id.* at 899 ("We hold that the definition of 'accident' required to establish an 'occurrence' under the policies cannot be satisfied by claims based upon faulty workmanship. Such claims simply do not present the degree of fortuity contemplated by the ordinary definition of 'accident' or its common judicial construction in this context."). In reaching this holding, the Court suggested that natural and foreseeable acts, such as rainfall, which tend to exacerbate the damage, effect, or consequences caused *ab initio* by faulty workmanship also cannot be considered sufficiently fortuitous to constitute an "occurrence" or "accident" for the purposes of an occurrence based CGL policy. This suggestion is consistent with this Commonwealth's longstanding notion of legal and proximate causation in tort law. *See generally, Powell v. Drumheller*, 539 Pa. 484, 493, 653 A.2d 619, 623 (1995) ("In determining whether an intervening force is a superseding cause, the test is whether the

---

8. United raises a similar argument. United

Policyholders *amicus curiae* brief at 25–28.

intervening conduct was so extraordinary as not to have been reasonably foreseeable.") (citations omitted).

¶ 26 Gambone's next argument is merely a re-characterization of its initial argument. Gambone points out that the definition of occurrence in the CGL and PL policies includes the phrase "continuous or repeated exposure to substantially the same general harmful conditions." *See e.g.*, Record, No. 2, *supra* at B, Exb. B, Sec. V, Definitions, at 22. Gambone maintains "the continued and repeated presence of water within" the home interiors fits within the literal language of this phrase and, as such, constitutes an "occurrence" for purposes of coverage. Gambone brief at 34.

¶ 27 Gambone's re-characterized analysis fails to account for the fact that the phrase "continuous or repeated exposure to substantially the same general harmful conditions" is directly preceded by the words "accident, including" in both the CGL and PL policy definitions of "occurrence." *See e.g.*, Record, No. 2, *supra* at B, Exb. B, Sec. V, Definitions, at 22. The premise of the definition when read in the entirety, therefore, is that coverage is triggered for an "occurrence," which is an "accident" that *can* include a series of fortuitous exposures to harmful conditions. *See Kvaerner, supra* at 899. To reiterate, damage caused by rainfall that seeps through faulty home exterior work to damage the interior of a home is not a fortuitous event that would trigger coverage. *Id.*

¶ 28 Gambone also attempts to demonstrate latent ambiguity by arguing the trial court erred by refusing to consider the amount of premium it paid for products-completed operations hazard coverage. Gambone reply brief at 15–16, *citing Rhone–Poulenc, Inc. v. International Insurance Co.*, 71 F.3d 1299 (7th Cir.1995).

Gambone points out that during 2002–2003 it paid approximately $253,296 for completed operations coverage while paying only $446,704 in premiums for all other coverages combined. *Id.* at 16.

¶ 29 Gambone's argument holds little persuasive value. Gambone invites this Court to comb through the various insurance policies, calculate what premiums were paid for specific grants of coverage, and then compare these calculations to discern whether it paid an amount which could lead us to believe it intended to purchase coverage for damages caused by the faulty workmanship of subcontractors.

¶ 30 The problem with Gambone's request is apparent; it has given us no framework within which to conduct such an inquiry. This Court will not step outside the certified record to embark on a *sua sponte* inquiry to determine what various insurers charge for such coverage; such an inquiry would prejudice Millers, who would not have the opportunity to provide rebuttal data. We have no idea what the prevailing market rates are for completed operations coverage riders which do not insure against faulty workmanship. Even if evidence in the certified record demonstrated Millers charges a high premium for such coverage, we have no idea whether Millers offers services that other insurers do not, such that the higher premium charged would be justified. Thus, we must decline Gambone's invitation.

## V. Surplusage

¶ 31 Gambone's next set of arguments proceeds from a different premise. Gambone argues that if it can be assumed *arguendo* Millers' interpretation of the definition of what constitutes an "occurrence" in the CGL and PL policies is correct, the exceptions to various exclu-

sions contained within those policies would be rendered mere surplusage. Gambone brief at 37.

¶ 32 In support of this argument, Gambone points to the following policy exclusion, its attendant exception, and the definition of the relevant phrase "your work" contained within the policy:

I. Damage to Your Work

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard."

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

*See e.g.,* Record, No. 2, *supra* at B, Exb. B, Sec. I, Exclusions, at 7.

22. "Your work":

a. Means:

(1) Work or operations performed by you or on your behalf; and

(2) Materials, parts or equipment furnished in connection with such work or operations.

*See e.g.,* Record, No. 2, *supra* at B, Exb. B, Sec. V, Definitions, at 24.

¶ 33 Gambone contends this language indicates the "drafters of the form insurance policy ... intended to exclude damage to the policyholder's own completed work for which the policyholder is being held liable, unless the damaged work or the work out of which the damage arises was performed on the policyholder's behalf by a subcontractor." Gambone brief at 39.

¶ 34 The governing rule of construction is well-settled. In construing an insurance policy, we are not permitted to treat words in the policy as mere surplusage and we must construe the policy in a manner that gives effect to all the policy's language if at all possible. *Tenos v. State Farm Insurance Co.,* 716 A.2d 626, 631 (Pa.Super.1998), *citing General Mills, Inc. v. Snavely,* 203 Pa.Super. 162, 199 A.2d 540, 544 (1964).

¶ 35 The fatal flaw in Gambone's argument is that if we were to accept its interpretation of the CGL and PL policies *in toto* we would be forced to render the definition of "occurrence" mere surplusage in every instance where a plaintiff sues a contractor for faulty work performed by a subcontractor on the contractor's behalf. *Tenos, supra* at 631 (citation omitted). The grant of coverage states that "property damage" will only be covered if caused by an "occurrence," which is, in turn, defined as an "accident." Inasmuch as both the Coloian and Caputo claims are premised on allegations of faulty workmanship, Gambone argues that the exception to the "your work" exclusion allows coverage to lie for claims based on faulty workmanship by a subcontractor.[9] Yet, claims predicated on faulty workmanship cannot be considered "occurrences" for purposes of an occurrence based CGL policy as a matter of plain language and judicial construction. *Kvaerner, supra* at 899. Gambone does not offer us any manner in which to rectify this seemingly insurmountable contradiction.

¶ 36 Conversely, the trial court's disposition of these cases allows for the term "occurrence" to be read in *pari materia*

9. The claims in both the Coloian and Caputo actions are all characterized as being premised on faulty workmanship. *See* Record Part 10 of 17, Action for Declaratory Judgment, Exb. A, *accord* Record, No. 2, Millers Prelimi-nary Objections, at Exb. A. We are bound by these characterizations as a matter of law. *Kvaerner, supra* at 896. Neither Gambone nor Universal challenges these characterizations.

with the exception to the "your work" exclusion in situations where a plaintiff sues a contractor for faulty work performed by a subcontractor. For example, a scenario could arise where a subcontractor confuses job orders and works on a part of a project on which it was not contracted to work; such a scenario would, in all likelihood, be considered an "occurrence" which would not be defined as faulty workmanship and would fit within the exception to the "your work" exclusion. We can also conjure up additional examples. · A subcontractor could use materials on a job not contemplated by the contractual arrangement between the contractor and subcontractor. An error such as this could also be considered· an "occurrence" and could fit within the exception to the "your work" exclusion.

¶ 37 Echoing Gambone, United raises a similar argument in its *amicus curiae* brief. United contends the definition of "your work" contained within the CGL and PL policies includes "Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of 'your work.' " Record, No. 2, *supra* at Exb. B., Sec. V, at 24. It contends the underlying claims in the Coloian and Caputo actions are, at least in part, based on allegations that Gambone breached warranties and representations they made concerning its subcontractors' work and, as such, these claims fit within the exception to the "your work" exclusion because these warranties attach to work performed on behalf of Gambone by subcontractors. We disagree.

¶ 38 Again, our goal is to read the language in the Millers policies in *pari materia* whenever possible. *Tenos, supra* at 631. And, as with the preceding argument, if we follow the interpretation for which United advocates, we would be violating the governing rule of construction.

¶ 39 United's argument requires us to allow coverage for claims predicated on warranties against instances of faulty workmanship performed by subcontractors, which are not "occurrences" as a matter of plain language and judicial construction. *Kvaerner, supra* at 899. United has offered us no way in which to rectify this contradiction. Accordingly, if there is anyway we can construe the definition of "occurrence," the definition of "your work," and the exception to the "your work" exclusion in *pari materia* we must adopt this construction.

¶ 40 We can think of situations where a contractor could warrant subcontractor work that can be defined as an "occurrence" and not faulty workmanship. For example, a contractor could warrant a subcontractor's work on a portion of a project on which the subcontractor was not contracted to work. This warranty would pertain to what would be, in all likelihood, defined as an "occurrence," that being an erroneously rendered performance. The warranty, therefore, would be considered "your work," yet would also fit into the exception to the "your work" exclusion because it would be deemed performance erroneously tendered by a subcontractor.

¶ 41 In sum, when we are forced to choose between two competing interpretations of an insurance policy, we are bound, as a matter of law, to choose the interpretation which allows us to give effect to all of the policy's language. *Tenos, supra* at 631. The interpretations offered by Gambone and United do not allow us to account for the definition of "occurrence" contained in the Millers policies; indeed, neither Gambone nor United offer any suggestion as to how we could read their respective interpretations in *pari materia* with the definition of "occurrence." Conversely, the trial court's disposition conceivably allows for claims based on a subcontractor's

erroneously tendered performance to fit within the exception to the "your work" exclusion.

## VI. The Reasonable Expectations Doctrine

¶ 42 Gambone next argues the trial court's interpretation of the CGL and PL policies defies the "reasonable expectations" Gambone had in purchasing these policies. Gambone brief at 44, *citing Tonkovic v. State Farm Mutual Auto. Insurance Co.*, 513 Pa. 445, 456, 521 A.2d 920, 926 (1987).[10] The problem with Gambone's argument is that it ignores the applicable rules of insurance policy interpretation.

■ ¶ 43 It is well-settled that when policy language is unambiguous, we give effect to that language. *Kvaerner, supra* at 897. It is also well-settled that the focus of any inquiry regarding issues of coverage under an insurance policy is the reasonable expectations of the insured. *Bubis v. Prudential Property & Casualty Insurance Co.*, 718 A.2d 1270, 1272 (Pa.Super.1998). An insured, however, may not complain that its reasonable expectations have been frustrated when the applicable policy limitations are clear and unambiguous. *Id., citing Bateman v. Motorists Mutual Insurance Co.*, 527 Pa. 241, 244–46, 590 A.2d 281, 283 (1991); *Neil v. Allstate Insurance Co.*, 379 Pa.Super. 299, 549 A.2d 1304 (1988); *St. Paul Mercury Insurance Co. v. Corbett*, 428 Pa.Super. 54, 630 A.2d 28 (1993) (*en banc*).

■ ¶ 44 The policy limitation at issue—namely, the definition of occurrence—is unambiguous as a matter of plain language and judicial construction. As Gambone has failed in its attempts to demonstrate latent ambiguity, the reasonable expectations doctrine is inapplicable.

¶ 45 United also invokes the reasonable expectations doctrine by asserting that when a consumer purchases a general liability policy the consumer expects to be protected from all liability, whether this liability arises from a breach of contract or a tort action. United's *amicus* brief at 23, *citing Vandenberg v. Superior Court*, 21 Cal.4th 815, 88 Cal.Rptr.2d 366, 982 P.2d 229, 245 (1999).

¶ 46 This argument, however, also ignores the applicable rules of construction. The occurrence limitation contained within the CGL and PL policies is unambiguous. United cannot circumvent this limitation without demonstrating ambiguity; it cannot do so.

¶ 47 In concluding with our analysis of the reasonable expectations doctrine, we note that applying the doctrine in the way for which Gambone and United advocate would undermine the fundamental principles of insurance contract law and impair the Commonwealth insurance industry. If we were to allow an insured to override the plain language of a policy limitation anytime he or she was dissatisfied with the limitation by simply invoking the reasonable expectations doctrine, the language of insurance policies would cease to have meaning and, as a consequence, insurers would be unable to project risk. The inability to project risk would dissuade insurers from doing business in the Commonwealth and the net result would be an increase in premiums for consumers. We

---

**10.** The parties disagree as to whether the "reasonable expectations" doctrine can be invoked by a "sophisticated" commercial enterprise. *See e.g., Pressley v. Travelers Property Casualty Corp.*, 817 A.2d 1131, 1140 n. 3 (Pa.Super.2003) (concluding that because the underlying dispute pertained to the reasonable expectation of a non-commercial insured the doctrine was applicable), *citing Madison Construction Co. v. Harleysville Mutual Insurance Co.*, 557 Pa. 595, 611, n. 8, 735 A.2d 100, 109 n. 8 (1999). The parties further disagree as to how to define what constitutes a "sophisticated" commercial enterprise. Due to our disposition of this appeal, we leave these questions for another day.

refuse to set such a deleterious sequence of events into motion.

## VII. Conclusion

¶ 48 Gambone raises additional arguments attacking the application of various exclusions in the policy. These arguments, however, are irrelevant in light of the fact that we have concluded the Coloian and Caputo claims do not arise out of "occurrences" within the meaning of the CGL and PL policies and, hence, are not within the affirmative grant of coverage of these policies.

■ ¶ 49 In construing the language of an insurance policy, we are bound by the plain language of the policy. The term "occurrence," as defined in the Millers CGL and PL policy, is defined in a manner that is unambiguous as a matter of plain language and common judicial construction. "Occurrence" refers to "accidental" phenomena—not claims predicated on allegations of faulty workmanship. No one disputes that the Coloian and Caputo claims are predicated on allegations of faulty workmanship. Neither Gambone nor *amicus* United was able to demonstrate latent ambiguity or offer any scenario in which we could look past the plain language of the term "occurrence" without either rendering the term mere surplusage or undermining general principles of insurance contract law. Accordingly, we conclude the trial court did not abuse its discretion or commit reversible error in granting Millers' motion and cross-motion for partial summary judgment while conversely denying Gambone's cross-motion for partial summary judgment. *Chanceford Aviation Props., LLP.*, 923 A.2d at 1103.

¶ 50 Orders affirmed.

J.F., Appellant