**EXECUTIVE RISK INDEMNITY, INC., Appellee**

v.

**CIGNA CORPORATION, Appellant.**

Superior Court of Pennsylvania.

Argued Jan. 28, 2009.

Filed June 3, 2009.

Reargument Denied Aug. 13, 2009.

David Kroeger, Chicago, IL, for appellant.

Ronald P. Schiler, Philadelphia, for appellee.

BEFORE: KLEIN and SHOGAN, JJ., and McEWEN, P.J.E.

OPINION BY KLEIN, J.:

¶ 1 CIGNA Corporation appeals from the order entered in the Court of Common Pleas of Philadelphia County entering declaratory judgment in favor of Executive Risk Indemnity, Inc. At issue was the determination of coverage for CIGNA by Executive Risk regarding claims made against CIGNA that it systematically, and in collusion with other health insurers, underpaid certain claims. These allegations represent both a civil Racketeer Influenced and Corrupt Organization (RICO) claim and breach of contract claim. CIGNA settled the underlying lawsuit for $140,000,000 without an admission of wrongdoing and without indicating how much of the settlement was apportioned for the RICO claim and how much to the breach of contract claim. The trial court determined the Executive Risk professional liability policy did not offer coverage for the claims made. After a thorough review of the submissions by the parties, the official record and relevant law, we reverse and remand for further proceedings consistent with this decision.

**History**

¶ 2 From 1999 to 2002, CIGNA was a defendant in several federal class action lawsuits. These lawsuits, usually referred to as the *Mangieri, Shane* and *Kaiser* cases, claimed that CIGNA, along with several other managed care organizations, systematically underpaid claims by medical providers submitted to them. The complaints charged CIGNA with breach of contract as well as RICO violations in conspiring with the other insurance companies to keep payments improperly low.[1] Eventually, *Mangieri* and *Shane* were consoli-

---

1. The *Mangieri* complaint, filed in Alabama in December 1999, names only CIGNA as a defendant. Also, the only two counts are RICO based. *Kaiser* also names only CIGNA as a defendant, but has claims for both breach of

contract and RICO. *Shane* names several defendants and raises claims for both breach of contract and RICO. *See* CIGNA Response to Executive Risk Motion for Summary Judgment, 4/30/07, Exhibits G, H & J.

dated under *Shane*. Then in 2003 CIGNA settled the *Shane* and *Kaiser* cases together under the auspices of the United States District Court, Southern District of Florida, docket number MDL No. 1334 *(In re Managed Care Litigation)*.

¶ 3 As is true in virtually all settled cases, there was no admission of wrongdoing. The settlement agreement also provided for specific means for class members to seek payment. These means were based on showing that certain claims previously submitted to CIGNA had been part of that class of claims that had allegedly been underpaid. There was also a statement in the settlement agreement that none of the claimants would be required to prove specific aspects of the RICO claims. Thus, while the settlement document acknowledged both breach of contract claims and RICO claims, the settlement agreement did not apportion the settlement amount between the claim types.

¶ 4 CIGNA then sought indemnity from its many professional responsibility insurers, including Executive Risk. Executive Risk claims that its policy does not cover the losses incurred in the underlying lawsuit/settlement because the losses are directly attributable to CIGNA's contractual duty to pay the claims of its medical providers seeking reimbursement. On the other hand, CIGNA claims that the settlement encompassed both breach of contract claims and RICO claims, therefore Executive Risk is bound to cover this claim.

¶ 5 The trial court ruled that because the claimants are seeking payment on the basis of service provided, the settlement was based on breach of contract and was therefore excluded from coverage.

**Discussion**

¶ 6 Initially, we note our scope and standard of review regarding the grant of summary judgment. We may reverse if there has been an error of law or an abuse of discretion. Our standard of review is *de novo*, and our scope is plenary. We must view the record in the light most favorable to the nonmoving party and all doubts as to the existence of a genuine issue of material fact must also be resolved against the moving party. *See Millers Capital Ins. Co. v. Gambone Bros. Dev. Co.*, 941 A.2d 706, 712 (Pa.Super.2007).

¶ 7 Additionally, the interpretation of an insurance policy is a question of law for the court. *Continental Casualty Co. v. Pro Machine*, 916 A.2d 1111, 1118 (Pa.Super.2007). "The polestar of our inquiry is the language of the policy." *Id.*

¶ 8 There is relevant language found throughout the policy in question.[2] First, we note the general insuring agreement for professional liability.

> If during the Policy Period or the Extended Reporting Period, if applicable, any Claim is made against the Assured for Wrongful Acts in the performance of Professional Services by or on behalf of the Assured or by persons whose Wrongful Acts the Assured is legally responsible (including, but not limited to, employees acting within the scope of their employment and agents of the Entity), Underwriters agree to pay on its behalf Loss resulting from such Claim.

Insuring Agreement V, Professional Liability, A, 1, at 17.

¶ 9 A "claim" is defined as:

> A civil, criminal, administrative or regulatory proceeding or inquiry initiated

---

2. The Executive Risk policy is a "follow form" policy that incorporates the terms of the lead policy, which is in this case a policy issued by Lloyds of London. Thus, the terms quoted actually come from the Lloyds policy.

against any of the Assureds which is commenced by the filing of a complaint or similar pleading, notice of the charges, formal investigative order, indictment or similar document.

Glossary of Terms, 4, (a), at 38.

¶ 10 A loss "shall not include the return of payment of premium, commission monies, or fees, but solely as respects to reinsurance claims," [3] and means "damages, settlements, judgments, awards and Defense Costs incurred by any Assureds." [4] While the definition of loss excludes "criminal or civil fines and penalties imposed by law," [5] loss does include "punitive or exemplary damages, treble damages and multiple damages." [6] We note that the RICO statute requires treble damages for a civil remedy. *See* 18 U.S.C. § 1964(c).

¶ 11 Finally, exclusions 4 and 7 are also relevant. These exclusions read as follows:

4. for liability of the Assured under contract or agreement, except liability which would have attached to the Assured even in the absence of such contract or agreement;

7. for benefits, coverage, or amounts due or allegedly due, including any amount representing interest thereon, from the Assured as:

(a) an insurer or reinsurer, under any policy or contract or treaty of insurance, reinsurance, suretyship, annuity or endowment.

Insuring Agreement V, Professional Liability, Exclusions, C 4, 7(a), at 19.

**Policy Analysis—Exclusions**

█ ¶ 12 It is clear looking at the language of the policy that a simple breach of contract claim is not covered by this policy.

Both exclusions 4 and 7 prevent coverage from attaching where the loss claimed is for an amount due under the contract. This is entirely sensible. A policy that applies to a breach of contract, in a situation such as present here, would invite the policy holder to abdicate its responsibilities under contract with a subscriber knowing that its insurer would pick up the bill. That would be an absurd interpretation of this, or virtually any, professional liability policy.

█ ¶ 13 Therefore, if coverage attaches, it must be for the RICO claims. A RICO claim falls easily within the definition of a claim as provided in the policy. This was a civil claim instituted against the assureds by the filing of a complaint. Further, the wrongful acts complained of, RICO based claims, were allegedly taken by the assureds or by persons the assureds are legally responsible in the performance of their professional service regarding their operation as a managed care organization. Thus, the RICO claim falls within the general terms of coverage of the policy.

¶ 14 However, Executive Risk claims, and the trial court agreed, that the exclusions 4 and 7 remove the RICO claim from coverage. We disagree. While the RICO claims have their genesis in the contractual duty imposed on CIGNA to medical providers, the claims themselves involve the method of doing business—to wit, a claim that CIGNA and other insurers engaged in a policy designed to short change the providers. This is a subtle difference, but an important difference. The actions complained of are not simply the failure to pay a claim or using a procedure that underpays claims, which are the actions of a

---

**3.** Insuring Agreement V, Professional Liability, Additional Definitions, B, 5, at 17.

**4.** Glossary of Terms, 17, at 43.

**5.** *Id.*

**6.** *Id.*

breach of contract claim. The actions at the root of the RICO claims are the actions in agreement and the agreement itself between CIGNA and other insurers to systematically underpay claims. Also included are the claims that CIGNA, by itself, engaged in a system of underpaying claims. These actions allegedly support a separate and distinct claim from the breach of contract claim. Their genesis is not the simple failure to fulfill a contractual duty, but the operation of a system put in place to provide the professional services contracted for.

¶ 15 It is clear that for the system to violate RICO and provide a basis for liability, the continuing breach of contracts had to occur as well. We do not see how the system could provide the basis for liability if the services the system provides are acceptable. Nonetheless, the two claims are separate. If we accept Executive Risk's interpretation of the exclusions, then virtually any claim is excludable because it would, by necessity, involve in some manner the contractual duty to provide managed care services.

¶ 16 We note that the definition of loss specifically includes the payment of punitive, exemplary and treble damages. These types of damages in insurance matters typically arise through provision of the service associated with the insurance. Under Pennsylvania law, a bad faith claim provides for punitive damages. *See* 42 Pa.C.S. § 8371. A RICO claim provides for treble the underlying damages. We do not know of a claim, nor have we been provided with a type of claim, that would provide for punitive or treble damages that would not include to some degree a failure to provide the underlying contractual services. Because the policy specifically covers the treble damages found in a RICO claim, and a RICO claim otherwise fits within policy definitions, we believe the policy is meant to cover a RICO claim such has been presented in this case.

¶ 17 The trial court concluded, in part, that the Executive Risk policy was not applicable because the claim forms to be used by the providers specifically referenced the services provided which were un- or underpaid pursuant to contract. We agree with the trial court that the claims forms represent claims made pursuant to the breach of contract portions of the underlying lawsuits. However, it does not automatically follow that all claims under the settlement are for breach of contract.

¶ 18 As noted earlier, RICO provides for treble damages.

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefore in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee ...

18 U.S.C. § 1964(c). It seems obvious that in order to determine triple damages, one must first determine the amount of underlying damages. Thus, the starting point, at least, for calculating total damages must be the claim forms which detail the individual contractual breaches and damages. Far from representing the only damages recoverable, the claim forms appear to represent the starting point for determining damages.

¶ 19 We do not mean to form the basis of the allocation of settlement with the above observation. Although three parts to RICO to every one part actual damages is certainly an easy calculation, it is not necessarily the proper calculation. Given that a settlement typically represents concessions made by both parties we cannot determine what portion of the settlement is meant for what aspect of the claims

made. Further, the threat of triple damages may have tipped the hand in gaining a settlement, but again, that does not necessarily mean the settlement was offered with CIGNA believing that, had the case gone to trial, a finding of RICO violations was *fait accompli*. Therefore, the apportionment of settlement, a potentially important feature to the amount of coverage owed, will likely have to be determined through expert testimony.[7]

## Allocation

¶ 20 We have already noted the need for the trial court to determine the allocation of the claims between the covered RICO claims and excluded breach of contract claims. CIGNA has raised an issue on appeal that the trial court erred in granting Executive Risk's motion for summary judgment at least partially on the grounds that CIGNA had not demonstrated a need to allocate.

¶ 21 We believe that our ruling on the first issue largely addresses this point, so there is no need for a repetitive analysis. The need for allocation is inextricably bound to the realization that the underlying claims contained both covered and excluded causes of action and that the excluded breach of contract claims do not overwhelm and render moot the RICO claims. As noted, while Executive Risk cannot be expected to shoulder the burden of CIGNA's broken contracts, neither can Executive Risk expect to walk away from coverage bought and paid for by CIGNA that covers the RICO claims.

## Related Acts

■ ¶ 22 Executive Risk had claimed, in this matter as well as in a related case, *Aetna, Inc. v. Lexington Ins. Co*, 1487 EDA 2006, 953 A.2d 820 (2008), that it did not owe coverage in this matter because the instant claims against CIGNA related back to prior claims made against CIGNA prior to the inception of the Executive Risk policy in question. The trial court in this matter determined that the claims did not relate back. Our Court in *Aetna* ruled similarly.

· ¶ 23 CIGNA now claims that Executive Risk is estopped from raising this issue. CIGNA bases this argument on the unpublished decision of this court in *Aetna*. We note that the *Aetna* case has now been overruled, on other grounds not applicable to this matter, by our Supreme Court.[8] Thus, Executive Risk cannot be bound by the unpublished and overruled decision in *Aetna*.

¶ 24 We note that the substance of this issue is not before us. The only issue

---

7. We note also that there are competing public policy issues involved in apportioning the settlement between actual and RICO damages. As noted, the insurance policy at issue was not designed to allow CIGNA to simply shift the burden of paying a breach of contract claim to Executive Risk. By the same token, CIGNA paid for insurance coverage for certain aspects of this claim and there would be a problem with rendering the insurance coverage illusory if no payment under the policy were required.

8. *Aetna* was overruled on 3/26/09 by our Supreme Court because our Court had failed to address the issue of rescission, which had been raised before the lower court but not addressed by the lower court, having decided the issue on other grounds. *See Aetna, Inc. v. Lexington Ins. Co.*, Nos. 378–382 EAL 2008, 968 A.2d 229 (2009). One of the insurers in *Aetna*, RLI Insurance, raised the issue of rescission as an alternate means of affirming the trial court before our Court, but we did not address the issue. Rescission was apparently never raised in this matter. Unlike the *Aetna* matter, the lower court made no mention of rescission here and neither Executive Risk nor CIGNA have raised the issue on appeal. Executive Risk did not raise the issue in either its Complaint for Declaratory Judgment or Motion for Summary Judgment. Thus, we do not believe that we are required to follow *Aetna* and remand this matter based on a claim of rescission, the issue never having been raised.

before us is whether Executive Risk is collaterally estopped from raising the claim. Because Executive Risk has not had the opportunity to have this issue reviewed by an appellate court it may raise the issue in any subsequent appeal that may be necessary once the apportionment issue is decided and a final order is entered.

¶ 25 Order reversed. Case remanded for further proceedings consistent with this decision. Jurisdiction relinquished.

¶ 26 McEWEN, P.J.E., files a Dissenting Statement.

## DISSENTING STATEMENT by McEWEN, P.J.E.:

¶ 1 While the memorandum of the majority reveals a thorough analysis and presents a perceptive expression of rationale, I am impelled to this dissent. As I see it, Cigna, having entered into an agreement in the prior litigation not to classify their conduct as violative of the RICO statute,[1] can not now label and seek coverage for those actions as being wrongful RICO based conduct. Thus, Cigna's election of an expedient remedy in the prior litigation estops it from asserting a contrary claim here. Consequently, its liability to its policy holders in the prior litigation necessarily rested upon its denial of legitimate claims, which is not a covered loss under the Executive Risk policy.

¶ 2 Therefore, I would affirm the decision rendered by learned Judge Mark I. Bernstein.

---

1. The "RICO" statute is formally known as the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968.