PRECEDENTIAL


UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 09-2773

———————


SPECIALTY SURFACES INTERNATIONAL, INC.,
doing business as SPRINTURF, INC;
EMPIRE AND ASSOCIATES, INC.,
                                        Appellants


v.


CONTINENTAL CASUALTY CO.


———————


On Appeal From the United States District Court
For the Eastern District of Pennsylvania
(D.C. Civil Action No. 2-08-cv-02089)
District Judge:  Hon. John P. Fullam


———————


Argued February 25, 2010

Before: CHAGARES, STAPLETON, and
LOURIE,* *Circuit Judges*

(Opinion Filed: June 8, 2010)

Timothy P. Law (Argued)
Reed Smith
2500 One Liberty Place
1650 Market Street
Philadelphia, PA  19103
  Attorney for Appellants

Jay I. Morstein (Argued)
DLA Piper US
6225 Smith Avenue
Baltimore, MD  21209
  and
Ronald P. Schiller
Hangley, Aronchick, Segal & Pudlin
One Logan Square
18th & Cherry Streets - 27th Floor
Philadelphia, PA  19103
  Attorneys for Appellee

_____

OPINION OF THE COURT

_____

*Hon. Alan D. Lourie, United States Circuit Judge for the
Federal Circuit, sitting by designation.

STATELETON, <u>Circuit Judge</u>:

Appellants Specialty Surfaces International, Inc. ("Specialty Surfaces") and Empire and Associates, Inc. ("Empire") (collectively, "Sprinturf") appeal from a summary judgment entered by the District Court in favor of appellee Continental Casualty Company ("Continental"). The Court granted summary judgment after concluding that Pennsylvania law applied to the insurance coverage issue presented in this case and that Continental had no duty under Pennsylvania law to defend the appellants against claims asserted in a California lawsuit.

## I. Facts and Procedural Background

Specialty Surfaces is a Pennsylvania corporation with a principal place of business in Wayne, Pennsylvania. Empire is a California corporation with a principal place of business in Wayne, Pennsylvania. Empire is a wholly owned subsidiary of Specialty Surfaces, and together, doing business as Sprinturf, they manufacturer and sell synthetic turf for athletic playing fields. Continental, which is licensed to do business in both California and Pennsylvania, issued an insurance policy to Specialty Surfaces. Empire was covered by the policy as an additional named insured. The policy covered the period from

October 1, 2005, through October 1, 2006, and had a per occurrence limit of $1,000,000 and a general aggregate limit of $2,000,000. The parties agree that the insurance policy was in effect at the time of the events at issue in the underlying lawsuit and that it covered Sprinturf's activities in California.

In Specialty Surfaces' policy, Continental agreed to "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." JA 541. Further, Continental agreed that it had "the right and duty to defend the insured against any 'suit' seeking those damages." *Id.* The contract of insurance applied to "'bodily injury' and 'property damage' only if . . . [t]he 'bodily injury' or 'property damage' is caused by an 'occurrence' . . . ." *Id.* "Property damage" is defined in the policy as "[p]hysical injury to tangible property, including all resulting loss of use of that property," and an "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Id.* at 552-53.

At issue here is whether Continental had a duty to defend Sprinturf in a lawsuit filed in the Superior Court of California. According to the allegations in the amended complaint, Shasta Union High School District ("Shasta") hired Trent Construction as a general contractor on an approximately $3,000,000 project involving the construction and installation of synthetic turf football fields and all weather tracks at four District schools.

4

Trent Construction then hired Empire as a subcontractor to provide and install synthetic turf fields manufactured by Specialty Surfaces and to install drainage systems in the fields. The general contractor, Trent Construction, prepared the base for each field, and Empire installed a drainage system, provided by Airfield Systems, LLC ("Airfield"), including an impermeable liner, and the synthetic turf over the base. As part of the contract, Shasta required Trent Construction and each of the subcontractors to provide warranties for each of the four fields. Pursuant to this requirement, Sprinturf provided an eight-year warranty for each of the four fields.

Shasta initially filed a suit against Specialty Surfaces and Airfield. Shasta's factual allegations about the fields included the following:

> Commencing within one year after acceptance of the Project, the synthetic turf systems installed on the Project began to exhibit defects in materials and workmanship, which have since worsened. All the fields have experienced failures of the subdrain system under the synthetic turf, including splits in the subsurface impermeable membrane and inadequate sealing thereof. As a direct result, water has leaked from the subdrain system into the subgrade, dirt has washed from the subgrade into the subdrain system, the subgrade has settled and the soil stabilizer has

5

remulsified. Consequently, the fields have developed depressions and unstable playing surfaces, and the fields fail to drain properly under the synthetic turf. In addition, the synthetic turf material can be torn by hand and is not sufficiently strong for the uses guaranteed under specifications Section 2537, Paragraph 1.02A.

JA 605-06. Further, Shasta alleged that Specialty Surfaces, doing business as Sprinturf, breached the terms of the warranties by failing "to make good the aforementioned defects in materials and workmanship in a timely fashion." JA 607. Shasta claimed that it would have to pay a significant sum to replace the synthetic turf and the drainage system in each of the fields.

Specialty Surfaces provided Continental with notice of the lawsuit and requested coverage. Continental disclaimed coverage, explaining that the policy only covered an "occurrence" causing "property damage." Continental stated that the commercial general liability policy did not cover Shasta's claim because "[t]he allegations are solely poor workmanship and/or product" and "[a]ny damage that your company can be responsible for would be for improper installation or a defect in the product itself." JA 1465–69.

Shasta then filed an amended complaint. Specialty Surfaces remained a defendant, and Empire was added as a

6

defendant. The allegations as to the conditions of the fields remained identical to those in the original complaint, but Shasta included additional legal claims. In addition to breach of warranty claims against Specialty Surfaces and Empire, Shasta added a claim for negligence against Empire, Trent Construction, and Airfield. The relevant allegations are as follows:

45. Defendants Trent, Empire & Associates, [and] Airfield . . . at all relevant times owed the District duties of care including the duties to design, supply, supervise the correct installation and/or correctly install a suitable turf and subdrain system in compliance to the contract documents.

46. Said Defendants breached said duties of care by failure to investigate, test, and design and supply a suitable and compatible subdrain system and impermeable liner in compliance to the contract documents, failure to supervise the installation and install the supplied system properly and in a workmanlike manner, failure to provide adequate training and instructions to the installers and failure to conduct sufficient investigations and inspections to ensure the proper design, manufacture and installation of the

7

synthetic drain system.

> 47.  As a proximate result of said breaches of duty of care, the installed turf and subdrain system has failed, damaging the subdrains, the impermeable liner and the subgrade underneath, and the seams of the synthetic turf system are failing. . . .

JA 619.  Thus, this claim alleges that Empire's negligence led to damage to the turf, the subdrain system, the liner, and the subgrade.

After the amended complaint was filed, Continental agreed to defend Specialty Surfaces in the California action, subject to a reservation of rights.  Continental stated that it agreed to provide a defense because the amended complaint alleged that negligence resulted in damage to the base below the playing fields and the drainage system.  Subsequently, Continental also agreed to defend Empire as an additional named insured.

Continental, however, continued to refuse to reimburse Sprinturf for its expenses in defending itself before Continental received notice of the amended complaint.  It also declined to pay Sprinturf's defense counsel the $430 per hour rate he charged.  Continental offered to pay $200 an hour to Sprinturf's counsel or to provide Sprinturf with different counsel. Eventually, Sprinturf changed counsel as a result.

8

Sprinturf then commenced this action in the District Court for the Eastern District of Pennsylvania seeking a declaratory judgment that Continental had a duty to defend and to indemnify against any liability in Shasta's suit. Sprinturf moved for partial summary judgment on the issue of when Continental was required to provide for its defense. Sprinturf contended that Continental was required to provide a defense when it received notice of Shasta's original complaint because the Shasta complaint alleged property damage to another party's work product. In response, Continental filed a cross-motion for summary judgment, arguing that Sprinturf could not establish that it was required to defend or indemnify it based on the allegations in either of the Shasta complaints. Specifically, Continental argued that the property damage alleged in the Shasta complaints was not caused by an "occurrence" covered under the policy and, in the alternative, that policy exclusions applied to the type of damage alleged.

The District Court entered summary judgment in favor of Continental. It first concluded that Pennsylvania law applied to the issue of coverage under the insurance contract. The Court then determined that all of the claims in Shasta's lawsuit, including the negligence claims, were based on "allegations of faulty workmanship and failure to comply with the contract documents, which are not accidents." JA 6. Accordingly, the Court held that the alleged property damage had not been caused by an "occurrence" and that Continental had no duty to defend Sprinturf under Pennsylvania law.

9

Sprinturf filed a timely notice of appeal.[1]

## II. Choice of Law

The parties agree that the choice of law rules of the forum state, Pennsylvania, apply when a federal court is sitting in diversity. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Further, they agree that Pennsylvania applies a "flexible rule which permits analysis of the policies and interests underlying the particular issue before the court" and directs courts to apply the law of the state with the "most interest in the problem." *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 227 (3d Cir. 2007) (quoting *Griffith v. United Air Lines, Inc.*, 203 A.2d 796, 805–06 (Pa. 1964)); *see Budtel Assocs., LP v. Continental Cas. Co.*, 915 A.2d 640, 644-45 (Pa. Super. Ct. 2006) (holding that the *Griffith* choice of law rule applied in the contract law context). In applying this rule, if confronted with a true conflict, we first consider each state's contacts with the contract as set forth in the Restatement (Second) of Conflict of

---

[1]The District Court had jurisdiction pursuant to 28 U.S.C. § 1332. We have jurisdiction pursuant to 28 U.S.C. § 1291. We exercise plenary review over a District Court's choice of law analysis, *see Thabault v. Chait*, 541 F.3d 512, 535 (3d Cir. 2008), and its decision to grant summary judgment, *see State Farm Fire & Cas. Co. v. Estate of Mehlman*, 589 F.3d 105, 110 (3d Cir. 2009).

10

Laws. *See Hammersmith*, 480 F.3d at 231; *Compagnie des Bauxites de Guinee v. Argonaut-Midwest Ins. Co.*, 880 F.2d 685, 688-89 (3d Cir. 1989); *Melville v. Am. Home Assurance Co.*, 584 F.2d 1306, 1311 (3d Cir. 1978). We then "weigh the contacts on a qualitative scale according to their relation to the policies and interests underlying the [relevant] issue." *Shields v. Consol. Rail Corp.*, 810 F.2d 397, 400 (3d Cir. 1987).

We must first determine whether there is a true conflict between the relevant laws of California and Pennsylvania. *Hammersmith*, 480 F.3d at 230. A "'deeper [choice of law] analysis' is necessary only if *both* jurisdictions' interests would be impaired by the application of the other's laws." *Id.* (emphasis in original) (quoting *Cipolla v. Shaposka*, 267 A.2d 854, 856 (Pa. 1970)). When both states' interests would be harmed by the application of the other state's law, there is a "true conflict," and we must engage in the contacts and interests analysis to determine which state's law should apply. *Id.* at 230-31.

*A. Actual Conflict*

No relevant conflict has been identified in the laws of California and Pennsylvania with respect to when an insurer has a duty to defend an insured. In both jurisdictions, an insurance policy like that before us would be construed to impose a duty to defend if the facts alleged in support of a claim, taken as true, hold the potential for the imposition of a liability for which the

11

insured would be entitled to be indemnified under the policy. Sprinturf, however, in addition to arguing that it is entitled to coverage under Pennsylvania law, insists that there is a conflict between the laws of California and Pennsylvania with respect to whether the facts alleged by Shasta hold that potential – *i.e.*, whether the alleged property damage results from an "occurrence" within the meaning of the policy.

We first consider the law of Pennsylvania. In *Kvaerner Metals Division of Kvaerner U.S., Inc. v. Commercial Union Insurance Co.*, 908 A.2d 888 (Pa. 2006), the Supreme Court of Pennsylvania was asked to decide whether a claim of faulty workmanship could constitute an "occurrence" under commercial general liability policies. The policies at issue defined an "occurrence" as an "accident, including continuous or repeated exposure to substantially the same or general harmful conditions." *Id.* at 897 (quoting the insurance policy). Because there was no definition of accident in the policies, the Supreme Court used a dictionary definition, observing that "[t]he key term in the ordinary definition of 'accident' is 'unexpected'" and that "[t]his implies a degree of fortuity that is not present in a claim for faulty workmanship." *Id.* at 898. The Court there held:

> We hold that the definition of "accident" required to establish an "occurrence" under the policies cannot be satisfied by claims based upon faulty workmanship. Such claims simply do not

12

present the degree of fortuity contemplated by the ordinary definition of "accident" or its common judicial construction in this context. To hold otherwise would be to convert a policy for insurance into a performance bond. We are unwilling to do so, especially since such protections are already readily available for the protection of contractors.

*Id*. at 899 (footnotes omitted). *Kvaerner*'s holding was limited to claims of damage to the work product itself. *Id.* at 900. It left open the question of whether damage to property other than the work product itself resulting from faulty workmanship might constitute property damage caused by an "occurrence" under a commercial general liability policy.

In *Millers Capital Insurance Co. v. Gambone Bros. Development Co.*, 941 A.2d 706, 713 (Pa. Super. Ct. 2007), the parties disputed whether an insurer had a duty to defend against claims for damages to property arising out of faulty workmanship. Specifically, the complaint alleged that faulty workmanship in constructing the exteriors of homes led the stucco exteriors to fail and resulted in "ancillary and accidental damage caused by the resulting water leaks to non-defective work inside the home interiors." *Id.* The insureds conceded that, under *Kvaerner*, the damages to the exteriors of the homes was not caused by an "occurrence" but argued that the damage to the interior of the homes was nevertheless caused by an

13

"occurrence" because the rainfall constituted an "occurrence."

The Superior Court rejected this proposition. Based on *Kvaerner*, the Court held "that natural and foreseeable acts, such as rainfall, which tend to exacerbate the damage, effect, or consequences caused *ab initio* by faulty workmanship also cannot be considered sufficiently fortuitous to constitute an 'occurrence' or 'accident' for the purposes of an occurrence based [commercial general liability policy]." *Id*.

In *Nationwide Mutual Insurance Co. v. CPB International, Inc.*, 562 F.3d 591 (3d Cir. 2009), this Court addressed whether under Pennsylvania law consequential damages resulting from faulty workmanship constituted an "occurrence" under a commercial general liability policy. In that case, the insured had sold a contaminated product which the purchaser had thereafter utilized with resulting damage to other property owned by the purchaser. We held that the resulting damage was not property damage caused by an "occurrence" because the purchaser's use was foreseeable and not fortuitous. In so holding, we determined that *Gambone* had persuasively predicted the view that the Supreme Court of Pennsylvania would take. *Id.* at 597 ("[O]pinions of intermediate appellate state courts are not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." (quoting *Nationwide Mut. Ins. Co. v. Buffetta*, 230 F.3d 634, 637 (3d Cir. 2000)). Because the Supreme Court of Pennsylvania has not subsequently issued

14

a contrary opinion, we must follow the determination of the *CPB International* panel. Thus, we must decline Sprinturf's invitation to reject *Gambone* and we accept both it and *CPB International* as accurately reflecting Pennsylvania law.

Based on *Kvaerner, Gambone* and *CPB International*, we conclude that Pennsylvania law interprets "occurrence" based coverage like that provided to Sprinturf in accordance with its literal text. In order for a claim to trigger coverage, there must be a causal nexus between the property damage and an "occurrence," *i.e.*, a fortuitous event. Faulty workmanship, even when cast as a negligence claim, does not constitute such an event; nor do natural and foreseeable events like rainfall.

Having so concluded, we now turn to California law to see if it conflicts with our understanding of Pennsylvania law. Sprinturf insists that the Supreme Court of California's decision in *Geddes & Smith, Inc. v. Saint Paul-Mercury Indemnity Co.*, 334 P.2d 881 (Cal. 1959), demonstrates such a conflict. In that case, a building contractor had ordered 760 aluminum doors, jambs, and associated hardware for use in constructing housing. After installation, defects appeared in virtually all the doors. The contractor sued the supplier alleging breach of warranty and negligence, and the supplier demanded that its insurer defend the contractor's suit. Under the policy, the insurer was committed to indemnify the insured for "all sums . . . the insured . . . become[s] obligated to pay by reason of liability imposed . . . because of injury to or destruction of property, including the

15

loss of use thereof, caused by accident." *Id*. at 883. It was undisputed that injury to or destruction of the doors themselves were expressly excluded.

The Court held that the supplier's liability arising from the damage to the houses caused by the defective doors was within the policy coverage. It reasoned as follows:

> Defendant contends that there was no injury to or destruction of property caused by accident. No all-inclusive definition of the word 'accident' can be given. It has been defined as 'a casualty something out of the usual course of events, and which happens suddenly and unexpectedly and without design of the person injured.' It "includes any event which takes place without the foresight or expectation of the person acted upon or affected by the event." 'Accident, as a source and cause of damage to property, within the terms of an accident policy, is an unexpected, unforeseen, or undesigned happening or consequence from either a known or an unknown cause.' The door failures were unexpected, undesigned, and [unforeseen]. They were not the result of normal deterioration, but occurred long before any properly constructed door might be expected to wear out or collapse. Moreover, they occurred suddenly.

16

*Id.* at 884 (citations omitted).

We agree that there is a conflict between *Geddes* and the Pennsylvania case law we have described. The *Geddes* Court would not have decided *Gambone* and *CPB International* in the same way the courts applying Pennsylvania law did. We note at the outset, however, the character of the issue involved and the conflict. In each instance, the issue before the Court was one of contract interpretation – *i.e.*, the meaning of "occurrence" and "accident" as used in the policy. While reaching different conclusions, the courts in each instance resolved the issue by seeking to determine the intent of the parties to the policy based on its text.

## B. True Conflict

We also agree with Sprinturf that a "true conflict" exists because the interests of both California and Pennsylvania would be adversely affected to some degree by application of the other state's law. *Hammersmith*, 480 F.3d at 231. California has an interest in whether the potential liability in the California litigation is covered, given that the property damage alleged is damage to a California school district and that one of the insured parties is a California corporation. Pennsylvania also has an interest in having its law apply to an insurance policy issued in Pennsylvania by a company licensed to do business in Pennsylvania to two companies that have their principal place of business in Pennsylvania. Pennsylvania has an interest in

having its law applied even if the insurer is not a Pennsylvania company. *Cf. Hammersmith*, 480 F.3d at 232 ("New York's interests are also implicated even though the insurer . . . is not a New York resident. There is no evidence that New York intended its . . . rule to protect only *resident* insurers, rather than all insurers doing business in the state of New York." (emphasis in original)). Therefore, we conclude that a true conflict exists, and we must therefore conduct an analysis of each state's contacts with the contract of insurance and its interests in having its law applied to the question at hand.

### C. Contacts and Their Relation to the Policies and Interests Underlying the Relevant Issue

We begin the Pennsylvania choice of law analysis by examining each state's contacts with the contract at issue under the Restatement (Second) of Conflict of Laws, "bearing in mind that '[w]e are concerned with the contract of insurance' and not the underlying tort," *Hammersmith*, 480 F.3d at 232-33 (quoting *McCabe v. Prudential Prop. & Cas. Ins. Co.*, 514 A.2d 582, 586 (Pa. Super. Ct. 1986)).

Section 193 of the Restatement (Second) of Conflict of Laws addresses casualty insurance policies such as this one. Section 193 states:

> The validity of a contract of fire, surety or casualty insurance and *the rights created thereby*

18

*are determined by the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy*, unless with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties, in which the local law of the other state will be applied.

Restatement (Second) of Conflict of Laws § 193 (emphasis added). Section 193 does not apply to the insurance policy issued to Sprinturf because there was no principal place of insured risk. *See Hammersmith*, 480 F.3d at 233 (holding that there was no principal place of insured risk where the policy covered the insured subsidiaries in over twenty states and internationally). The undisputed evidence in the record establishes that the policy was not limited to a specific state or project, that Sprinturf performed work nationally, and that the insurance company anticipated that it would cover risks outside of Pennsylvania. Although Empire, an additional named insured, performed work only in California, there was no principal location of insured risk in this policy.[2]

---

[2] In an argument raised for the first time in its reply brief, Sprinturf argues that Comment f. to § 193 suggests that it weighs in favor of applying California law. Even if this argument had not been waived, we would be unable to agree. Comment f. applies to a situation in which there are multiple,

When § 193 does not apply to the policy in question, we look next to the contacts listed in § 188(2) of the Restatement (Second) of Conflict of Laws to determine which state has greater contacts with the contract at issue. *Hammersmith*, 480 F.3d at 233; *Compagnie des Bauxites de Guinee*, 880 F.2d at 690. These factors include: "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties." Restatement (Second) of Conflict of Laws § 188(2). Section 188(2) directs that "[t]hese contacts are to be evaluated according to their relative importance with respect to the particular issue." *Id.*

In this case, the first and second factors, the place of contracting and negotiation, favor the application of Pennsylvania law because the parties agree that the insurance

---

site specific risks and the policy includes state specific forms for each risk. *See St. Paul & Marine Ins. Co. v. Building Constr. Enters., Inc.*, 526 F.3d 1166, 1168 (8th Cir. 2008). It advises that, with regard to this sort of policy, courts will likely consider treating the policy "as if it involved [separate] policies" and interpret each policy with regard to the law of the state in which the particular risk is located. Restatement (Second) of Conflict of Laws § 193 cmt. f. The policy at issue here is a commercial general liability policy, and, as discussed above, there was no site specific risk identified in the policy.

20

policy was negotiated, issued, and delivered in Pennsylvania.

The third factor, the place of performance, requires greater examination. Pursuant to the contract of insurance, Sprinturf was obligated to pay premiums to Continental, and, thus, it performed where it paid the premiums. *See, e.g.*, *Armotek Indus., Inc. v. Employers Ins. of Wausau*, 952 F.2d 756, 761 (3d Cir. 1991). Although Continental argues that this factor favors Pennsylvania law, the record does not reflect where the premiums were paid. Accordingly, we are unable to determine where Sprinturf performed its contractual obligations. Its principal place of business, however, was in Pennsylvania, and there is no reason to believe that premiums were paid in California.

For its part, Continental promised to defend or indemnify Sprinturf if certain events occurred, and thus it performs under the contract of insurance where it is required to defend or pay benefits to Sprinturf. In this instance, Continental's duty to defend, if required by the policy, was to be performed in California. Therefore, one of the places of performance was California. *See Hartford Underwriters Ins. Co. v. Found. Health Servs., Inc.*, 524 F.3d 588, 596 (5th Cir. 2008) (concluding that the insurer's performance took place where it defended the underlying lawsuits); *cf. Northern Ins. Co. of N.Y. v. Allied Mut. Ins. Co.*, 955 F.2d 1353, 1360 (9th Cir. 1992) (observing that the promise to provide a defense was one of the two "essential promises" the insurer made in a liability policy).

21

The fourth factor, "location of the subject matter of the contract," does not favor the application of either California or Pennsylvania law because the policy provided nationwide coverage to Sprinturf, and thus there is no identifiable location for the risk insured by the contract.

Next, we examine the domicile, residence, place of incorporation, and place of business of the parties. Both Specialty Surfaces and Empire have their principal place of business in Pennsylvania. Specialty Surfaces is also incorporated in Pennsylvania. Although Empire is incorporated in California, this contact is of lesser consequence because "a corporation's principal place of business is a more important contact than the place of incorporation. . . ." Restatement (Second) of Conflict of Laws § 188 cmt. e. Continental is incorporated in Illinois and licensed to do business in both California and Pennsylvania. Because both of the insured parties have their principal place of business in Pennsylvania and Continental's place of incorporation is neutral, this factor favors the application of Pennsylvania law.

Finally, we "must weigh these contacts on a qualitative scale according to their relation to the policies and interests underlying" the relevant issue on which there is a conflict – the coverage issue. *Shields*, 810 F.2d at 400. We note at the outset that, while California and Pennsylvania reach different conclusions on this specific issue, there are no conflicting governmental interests behind the positions of the two

22

jurisdictions. Neither jurisdiction has expressed a governmental interest favoring or disfavoring the disputed coverage. Both recognize the right of the negotiating parties to allocate risks of this kind for themselves and affirm the governmental interest in enforcing the agreement that they reach regarding that matter. The conflict before us is thus unlike conflicts between state laws regarding the validity of particular contract provisions, conflicts based on differing views on regulatory issues, or conflicts regarding issues where state law supplements the agreement of the parties by filling gaps left by the parties. Where, as here, the sole interest of both jurisdictions is in enforcing the intent of the parties, we believe Pennsylvania's choice of law rules would favor giving primary weight to the jurisdiction providing the context in which the decision making parties negotiated their agreement. Accordingly, in this case, we believe that the place of contracting, the place of negotiation, and the parties' principal places of business are the most important contacts when determining which state's law should be applied. In short, Pennsylvania law was the context in which the parties negotiated and expressed the agreement they had reached. While Empire was a California corporation, it was a non-participating beneficiary of its parent's negotiations and its business was conducted from Pennsylvania.

Contrary to Sprinturf's argument, we believe that the place of performance of any duty on the part of Continental to defend the underlying lawsuit is entitled to relatively little weight. The state in which a claim is filed and Continental is

23

required to defend a lawsuit is not significantly related to the coverage question at issue here. This is not a case in which the disputed issue relates to extra-contractual requirements imposed by the forum state regarding the manner in which a duty to defend must be executed. Rather, the issue is the intent of the parties when they allocated risks in the policy. This distinction is well illustrated by the Fifth Circuit's decision in *Foundation Health Services*. The underlying suit there had been filed in Mississippi and, under Mississippi law, an insurer defending an insured under a reservation of rights is required to provide independent counsel to the insured. The Court held that Mississippi law governed the "narrow issue" of whether the insurer was required to provide independent counsel. In doing so, however, it stressed that the case before it was materially different from the typical case involving only contract interpretation:

> We recognize that the place of contracting and place of negotiation are often relevant to disputes involving contract interpretation. Further, we acknowledge that, to some extent, whether Hartford has a duty to provide independent counsel to Magnolia is related to the scope of Hartford's contractual duty to defend. However, this case is different from the typical contract interpretation case. Typically, a duty to defend provision can be interpreted without reference to where the underlying "defending" is

24

taking place, because the task of pure contract interpretation merely requires the court to ascertain the parties' intent from the language of the contract itself and, at times, the circumstances surrounding formation of the contract. *See One South, Inc. v. Hollowell*, 963 So.2d 1156, 1162 (Miss. 2007) (discussing contract interpretation principles). This case is different because the issue of whether Hartford owed a duty to provide Magnolia with independent counsel is closely connected to the court where the "defending" took place. The court where a case is tried has a substantial interest in preventing conflicts of interest. In other words, the court where a claim is tried has little interest in whether an insurer's duty to defend is triggered under an insurance contract, but it does have a significant interest in whether independent counsel is provided to avoid a conflict of interest.

524 F.3d at 595-96. The comments to the Restatement (Second) of Conflict of Laws observe that "the place of performance can bear little weight in the choice of the applicable law when . . . at the time of contracting it is either uncertain or unknown . . . ." Restatement (Second) of Conflict of Laws § 188(2) cmt. e. Here, the parties did not know at the time of contracting where Continental might be called upon to defend Sprinturf, as Sprinturf operated nationwide. Thus we give the place of

25

performance less weight in our analysis.

Moreover, even if we were to accept Sprinturf's argument that the place of performance should be given greater weight in this dispute, Pennsylvania still has more significant contacts with this contract of insurance than California. Indeed, California had only limited contacts with the insurance contract until Shasta was allegedly harmed and the lawsuit was filed in California. *See Hammersmith*, 480 F.3d at 232-33 ("'We are concerned with the contract of insurance' and not the underlying tort." (quoting *McCabe*, 514 A.2d at 586)).

Based on the foregoing, we conclude that Pennsylvania has a far greater interest in having the coverage issue determined in accordance with its law than California has in having that issue determined in accordance with California law. Accordingly, we will determine the coverage issue based on Pennsylvania law.

In reaching this conclusion, we are not unmindful of Sprinturf's insistence that a contrary result is dictated by our decision in *American Contract Bridge League v. Nationwide Mutual Fire Insurance Co.*, 752 F.2d 71 (3d Cir. 1985). We conclude that *American Contract Bridge League* is not binding on our panel for at least two reasons.

In January of 1985, a panel of this Court issued an opinion applying Pennsylvania choice of law rules in a suit

26

involving a dispute over an insurer's duty to defend. *See American Contract Bridge League*, 752 F.2d at 74-75. The case involved two insurance policies, one of which was negotiated, issued, and delivered in Tennessee and issued to an entity with its principal place of business in Tennessee. The underlying lawsuit involved a Pennsylvania plaintiff, alleged that the harm occurred in Pennsylvania, and was filed in Pennsylvania. In the federal litigation, the parties disagreed about whether the policy required the insurer to defend the insured against claims made in the underlying lawsuit. The opinion resolved the choice of law issue with the following brief analysis:

> In *Griffith v. United Air Lines*, 416 Pa. 1, 203 A.2d 796 (1964), the Pennsylvania Supreme Court adopted a flexible choice-of-law rule which permits an "analysis of the policies and interests underlying the particular issue before the court" and a determination of which jurisdiction is most intimately concerned with the outcome of the litigation. *Id*. at 21, 22, 203 A.2d 796.

> Both Nationwide and Aetna are licensed to do business in Pennsylvania. The *Livezey* suit has been brought in Pennsylvania and involves the Pennsylvania Contract Bridge Association, as well as several Pennsylvania residents. The harm alleged in the *Livezey* suit occurred in Pennsylvania. Clearly, under Pennsylvania's

27

"policy, interests and contacts test," it is Pennsylvania law which should be applied to resolve the present controversy.

752 F.2d at 74–75.

While our opinion makes clear that there was a dispute as to the insurer's duty to defend and "as to which state law should be applied to the issues in [this] case," *id*. at 74, it does not identify how those state laws differed in a relevant manner, and one can accordingly not determine the issue as to which there was a conflict. Most importantly for present purposes, the opinion does not address any coverage issue turning on a dispute as to the intent of the contracting parties. As a result, there is no holding relevant to the issue before us.

However, even if *American Contract Bridge League* had held that the place of the harm giving rise to the tort liability and the forum of the underlying tort suit should be given controlling weight in determining the law to be applied in determining coverage from the intent of the contracting parties, we would not consider ourselves bound by its holding.

When a federal court sitting in Pennsylvania exercising diversity jurisdiction is faced with a choice of law question, generally it must predict how the Supreme Court of Pennsylvania would decide the question. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78-80 (1938); *Buffetta*, 230 F.3d at 637.

28

In making such a prediction, a federal court follows relevant decisions of the Pennsylvania Supreme Court and gives "due regard, but not conclusive effect" to decisions of the state's lower courts. *See Buffetta*, 230 F.3d at 637. In situations like the one before us, where the case said to be controlling is twenty-five years old, a federal court cannot properly determine the precedential value of that case without considering whether there have been relevant developments in the state case law during the intervening period. *Nationwide Ins. Co. of Columbus, Ohio, v. Patterson*, 953 F.2d 44, 46 (3d Cir. 1991) ("[W]hen we are applying state law we are, of course, free to reexamine our state law interpretation based on subsequent decisions" of the state courts.).

Since the decision in *American Contract Bridge League* was issued in 1985, the Pennsylvania Superior Court has decided a line of cases in which it applied Pennsylvania choice of law rules to determine which state's law governed interpretation of a contract of insurance. *See, e.g.*, *Budtel Assocs.*, 915 A.2d at 643-45; *Hughes v. Prudential Lines, Inc.*, 624 A.2d 1063, 1066 n.2 (Pa. Super. Ct. 1993); *McCabe*, 514 A.2d at 585-86. In each of these cases, the Superior Court consistently emphasized that Pennsylvania's choice of law rules were concerned with examining the states' contacts with the contract of insurance, not the tort involved in the underlying suit. *See Budtel Assocs.*, 915 A.2d at 643; *Hughes*, 624 A.2d at 1066 n.2; *McCabe*, 514 A.2d at 585-86. While the Supreme Court of Pennsylvania has not spoken on this issue, we believe

29

that the cases decided by Pennsylvania's intermediate courts of appeals in the twenty-five year period after the decision in *American Contract Bridge League* constitute intervening authority. This intervening authority suggests that the panel in *American Contract Bridge League* was mistaken if it predicted that the Pennsylvania Supreme Court in a case turning on interpretation of an insurance policy would apply the of law of the state where the tort occurred and the tort lawsuit was filed instead of the law of the state with the most significant contacts with the contract of insurance. Following the guidance of the Pennsylvania Superior Court, we predict that the Pennsylvania Supreme Court would decide that Pennsylvania law applied to this coverage dispute.

## III.  Duty to Defend

Under Pennsylvania law, "[a] carrier's duty to defend and indemnify an insured in a suit brought by a third party depends upon a determination of whether the third party's complaint triggers coverage." *Kvaerner*, 908 A.2d at 896 (citing *Mut. Benefit Ins. Co. v. Haver*, 725 A.2d 743, 745 (Pa. 1999)). We examine only the allegations in the complaint when determining whether the insurance company must defend the insured. We now turn to the question of whether the allegations in the original complaint or the amended complaint triggered coverage under the policy issued to Sprinturf.

### A.  Original Complaint

Continental did not have a duty to defend Sprinturf when it received notice of the original complaint in the California litigation. Shasta alleged in the original complaint only that Specialty Surfaces breached its contract with the school district by failing "to make good . . . defects in materials and workmanship in a timely fashion." JA 607. As earlier noted, we predicted in *CBP International* that a breach of contract claim could not constitute an "occurrence" in a commercial general liability policy under Pennsylvania law. *See* 562 F.3d at 598 ("We are, therefore, confident that the Supreme Court of Pennsylvania would conclude that an underlying claim alleging breach of contract would not trigger coverage under a [commercial general liability] policy."); *see also Pa. Mfrs. Assoc. Ins. Co. v. L.B. Smith, Inc.*, 831 A.2d 1178, 1181 (Pa. Super. Ct. 2003) ("Pennsylvania law does not recognize the applicability of a general liability policy to breach of contract and breach of warranty claims."); *Redevelopment Auth. of Cambria County v. Int'l Ins. Co.*, 685 A.2d 581, 592 (Pa. Super. Ct. 1996) (en banc). Accordingly, Continental did not have a duty to defend Specialty Surfaces after receiving notice of the original complaint.

## B. Amended Complaint

Neither was Continental required by the policy to defend Sprinturf after it received notice of the amended complaint. In the amended complaint, Shasta alleged that Empire was negligent in designing, manufacturing and installing a suitable

31

and compatible subdrain system and impermeable liner in compliance to the contract documents. As a result, Shasta alleged that there was damage to the synthetic turf, the impermeable liner, the subdrain system, and the subgrade.

Continental was not required to defend Sprinturf because the allegations in the amended complaint do not support a determination that any damage was caused by an "occurrence." Any damages to Empire's own work product based on Empire's alleged negligence are claims of damage based on faulty workmanship. Because they are not caused by an accident, under *Kvaerner*, they are not a covered "occurrence" under the insurance policy. *See* 908 A.2d at 889-90.

Sprinturf, however, argues that the damage to the subgrade, which was prepared by Trent Construction, was accidental, and thus constitutes a covered occurrence. This argument is foreclosed by the Superior Court's decision in *Gambone*, in which the Court rejected a similar argument made by the insured. There, the insured alleged that there was "ancillary and accidental damage" caused by water leaks that resulted from faulty workmanship. 941 A.2d at 713. The insured argued that the water damage to the non-defective work constituted an occurrence under the policy. Relying on *Kvaerner*, the Superior Court rejected the argument that the damage caused by water leaks resulting from faulty workmanship was an occurrence. The Court observed that the *Kvaerner* Court's emphasis on the "degree of fortuity"

32

"suggested that natural and foreseeable acts, such as rainfall, which tend to exacerbate the damage, effect, or consequences caused *ab initio* by faulty workmanship also cannot be considered sufficiently fortuitous to constitute an 'occurrence' or 'accident' . . . ." *Id.* Thus, damages that are a reasonably foreseeable result of the faulty workmanship are also not covered under a commercial general liability policy. *Id.* at 713-14; *see also CBP International*, 562 F.3d at 596-97.

Here, Shasta alleged that Empire installed the subdrain system, the impermeable liner, and the synthetic turf. In addition to defects in Empire's work product, Shasta alleged that "as a direct result" of the problems with the subdrain system, "water has leaked from the subdrain system into the subgrade, dirt has washed from the subgrade into the subdrain system, the subgrade has settled and subgrade soil stablilizer has remulsified. Consequently, the fields have developed depressions and unstable playing surfaces . . . ." JA 615. Thus, the amended complaint alleges that the damage to the subgrade was caused by water leaks that resulted from the faulty workmanship. But water damage to the subgrade is an entirely foreseeable, if not predictable, result of the failure to supply a "suitable" impermeable liner or properly install the drainage system. Thus, as in *Gambone*, this damage is not "sufficiently fortuitous to constitute an 'occurrence' or 'accident.'" 941 A.2d at 713.

Sprinturf insists that *Gambone* is distinguishable from

33

our case because the plaintiffs there did not allege damage beyond the structure of the house, which was the work product of the insured. This argument, however, ignores that the *Gambone* Court, following *Kvaerner*, clearly focused on whether the alleged damage was caused by an accident or unexpected event, or was a foreseeable result of the faulty workmanship when deciding whether the policy covered the damage. Here, water damage to the subgrade was a foreseeable result of the failure to supply a suitable liner or "to ensure the proper design, manufacture and installation of the synthetic turf and subdrain system." JA 619. Accordingly, we believe the District Court properly predicted that the Pennsylvania Supreme Court would decide that Continental did not have a duty to defend Sprinturf in the California litigation. It follows that Continental had no duty to indemnify Sprinturf.

## IV. Conclusion

For these reasons, we conclude that Pennsylvania law applies to this insurance coverage dispute and that Continental had no duty to defend Sprinturf under its commercial general liability policy. Therefore, we will affirm the judgment of the District Court.

34