J-A28020-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| VICKY HAGEL AND HAROLD RIETHMAN | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellants | |
| v. | |
| JOSEPH A. FALCONE, JR., AND PENN FRAMING COMPANY INC. A/K/A PENN FRAMING AND CONSTRUCTION COMPANY, AND ERIE INSURANCE CO. | |
| Appellees | No. 614 EDA 2014 |

Appeal from the Judgment Entered on February 7, 2014
In the Court of Common Pleas of Delaware County
Civil Division at No.: 07-3039

BEFORE:  GANTMAN, P.J., WECHT, J., and JENKINS, J.

MEMORANDUM BY WECHT, J.:                **FILED DECEMBER 23, 2014**

Vicky Hagel and Harold Riethman ("Appellants") appeal the trial court's February 7, 2014 order, which dissolved with prejudice Appellants' garnishment against Erie Insurance Co. ("Garnishee") and entered judgment in Garnishee's favor.  At issue in this case is Appellants' effort to recover for damages caused to their personalty by the substandard workmanship provided by Appellee Penn Framing Co. Inc. ("Penn Framing") in constructing Appellants' house.  When Appellants obtained a default judgment against Penn Framing, they sought to recover from Garnishee,[1]

---

[1]   Appellants reached a settlement and release of claims with Joseph A. Falcone, Jr.  Consequently, Falcone is not a party to the instant appeal.

which eventually resulted in the garnishment at issue. The issues presented test the breadth of a series of recent holdings by our Supreme Court and this Court, which collectively stand (at least) for the proposition that an insurer has no duty to defend or indemnify its insured under an occurrence-based commercial general liability ("CGL") policy for claims based upon workmanship when the damages in question arise from harm caused by faulty workmanship to the work or product in question. We affirm.

Because the order appealed from is in the nature of a summary judgment proceeding, we begin with our standard of review:

> An appellate court may reverse the grant of a motion for summary judgment if there has been an error of law or an abuse of discretion. Since the issue as to whether there are no genuine issues as to any material fact presents a question of law, our standard of review is *de novo*; thus, we need not defer to the determinations made by the lower tribunals. Our scope of review, to the extent necessary to resolve the legal question before us, is plenary. We must view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party.

*Millers Capital Ins. Co. v. Gambone Bros. Dev. Co.*, 941 A.2d 706, 712 (Pa. Super. 2007) (quoting *Chanceford Aviation Props., LLP. v. Chanceford Twp. Bd. of Supervisors*, 923 A.2d 1099, 1103 (Pa. 2007)).

Appellants' averments, viewed in the light most favorable to them, support the following account.[2]  On March 22, 2002, Appellants entered into a contract with Falcone for the construction of a home in Havertown, Delaware County, Pennsylvania.  Construction was completed in July 2002.  In August 2002, a storm struck the area, bringing rainfall that revealed a damaging leak around the frame of a window in Appellants' new house.  The same window continued to leak on various occasions between August 22, 2002, and March 27, 2005, causing water damage to the structure and Appellants' personalty.  On each occasion, Appellants reported the damage to Falcone, who attempted, on a number of occasions but in vain, to fix the problem.

On March 27, 2005, rain caused leaks around other windows, further damaging the structure and Appellants' personalty.  Appellants reported the new leak, but Falcone stopped responding to Appellants.  In May 2005, Appellants informed Falcone that drywall had begun to separate from various windows around the house.  Approximately six weeks later, Appellants advised Falcone that the water continued to penetrate the house, and that the damage was getting worse.  They also advised Falcone of their fears regarding the growth of mold and fungus.  Appellants further explained that

---

[2]    Appellants and the trial court disagree as to which of Appellants' numerous complaints and amended complaints is operative in the instant matter.  **See** *infra* n.3.  However, the factual accounts contained in the two complaints are materially identical.

- 3 -

leaks had developed around all of the windows on the east side of the house, and that water had wicked into the attic, causing mold to grow.

Appellants retained a professional engineer to inspect the home. The inspection revealed that the windows had been improperly installed in various particulars. The inspector also noted that the stucco siding was improperly installed and thinner than indicated, resulting in cracking that increased the home's vulnerability to water. The inspector detected excessive moisture readings in several areas around the house.

Based upon the foregoing allegations, Appellants brought suit against Falcone and Penn Framing in the Delaware County Court of Common Pleas, whereafter Appellants and Falcone engaged in various pleadings and numerous amendments to Appellants' complaint. Penn Framing did not appear to defend itself. For present purposes, it suffices to identify the August 10, 2009 complaint as the operative complaint.[3,4]  Therein,

_____

[3]  Appellants provide in their reproduced record a copy of a complaint filed on August 3, 2009, and the docket reflects its entry. However, the certified record does not contain that complaint. Instead, it contains an August 10, 2009 complaint, at the top of which someone noted by hand "entered twice." The August 3, 2009 complaint contained in Appellants' reproduced record is materially identical to the August 10, 2009 complaint. According to the docket, on October 13, 2009, yet another complaint was filed, although it, too, is missing from the certified record. On April 1, 2010, the trial court entered an order reinstating what Appellants denominated their third amended complaint, which we believe to refer to the earlier April 23, 2008 complaint that the trial court and Garnishee identify as the operative complaint. *See* Trial Court Opinion, 5/14/2014, at 2; Brief for Garnishee at 10 (citing the April 23, 2008 complaint).
*(Footnote Continued Next Page)*

Appellants asserted negligence claims against both Falcone and Penn Framing. Falcone filed an answer and new matter to Appellants' complaint, to which Appellants responded on December 11, 2009.

On May 6, 2010, Penn Framing was served with Appellants' third complaint. However, Penn Framing did not respond.[5] On August 18, 2010, Appellants filed a praecipe for default judgment against Penn Framing, pursuant to which judgment was entered against Penn Framing.

On December 13, 2010, Falcone filed a motion for summary judgment. On January 14, 2011, Appellants filed a response to Falcone's motion as well as their own motion for summary judgment against Falcone. On January 31, 2011, the trial court denied these motions as moot because Appellants and Falcone had negotiated a settlement of Appellants' claims against Falcone.

_(Footnote Continued)_ ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

The August 10, 2009 complaint alleges only negligence against Falcone and Penn Framing, omitting various contract, warranty, and Uniform Trade Practices and Consumer Protection Law claims that were asserted in the April 23, 2008 complaint. Before this Court, Appellants, who must establish a basis upon which Garnishee had a duty to provide insurance coverage to Penn Framing, rely upon only their negligence claims. Thus, we treat Appellants' more limited, August 10, 2009 complaint as the relevant pleading.

[4] By 2009, Harleysville Insurance Company had assumed Appellants' representation to recover moneys that Harleysville had remitted to Appellants under the Appellants' homeowners insurance policy.

[5] The docket indicates that Penn Framing also had been served with several earlier complaints.

On March 21, 2011, the trial court held a non-jury trial to assess Appellants damages *vis-à-vis* Penn Framing, which again did not appear. On the same day, the trial court entered judgment for Appellants and against Penn Framing in the amount of $177,135.33.

On August 9, 2012, Appellants filed a praecipe for a writ of execution against Penn Framing and Garnishee in the Erie County Court of Common Pleas. After further proceedings that need not be recited at length, on March 26, 2013, Appellants filed a petition to amend their prior pleadings to request entry of judgment against Garnishee. On April 16, 2013, Garnishee filed a response. Therein, Garnishee contended that Appellants were not entitled to judgment against it because the policy underlying the garnishment did not offer coverage to Penn Framing for Appellants' claims.

By stipulation entered on January 9, 2014, the parties agreed that the pending motions should be decided in the Delaware County court as though they had been filed there *ab initio*. Finally, on February 7, 2014, following supplemental briefing, the Delaware County Court of Common Pleas granted Garnishee's motion for judgment and to release property from attachment. This timely appeal followed. The trial court directed Appellants to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b), and Appellants timely complied. On May 14, 2014, the trial court issued its Rule 1925(a) opinion.

Before this Court, Appellants set forth the following issues:

1.    Did the Honorable Trial Court commit an error of law in granting [Garnishee's] Motion for Summary Judgment because the [CGL] Policy issued to [Penn Framing] provided coverage for the judgment assessed against Penn Framing for negligent work which damaged [Appellants'] property other than the work itself?

2.    Did the Honorable Trial Court commit an error of law in granting [Garnishee's] Motion for Summary Judgment as a matter of law because the . . . policy issued to [Penn Framing] provided "Completed Operations" coverage, and as such specifically provided coverage for damages and losses cause[d] by Penn Framing's defective product or work?

Brief for Appellants at 4-5 (Appellants' proposed answers omitted).

In its Rule 1925(a) opinion, the trial court explained that the events underlying Appellants' complaint did not constitute "occurrences" as defined in the CGL policy Penn Framing maintained with Garnishee. The trial court found that this case was controlled by our Supreme Court's decision in ***Kvaerner Metals Division of Kvaerner U.S., Inc., v. Commercial Union Insurance Co.***, 908 A.2d 888 (Pa. 2006), and progeny, which sought to establish the scope of an "occurrence" as defined in CGL policies in language materially identical to the definition in the policy *sub judice*.

The trial court's ruling, the parties' arguments, and our disposition all hinge upon our interpretation and application of our Supreme Court's ruling in ***Kvaerner***, *supra*, as well as this Court's subsequent decisions in ***Gambone Brothers***, *supra*, ***Erie Insurance Exchange v. Abbott Furnace Co.***, 972 A.2d 1232 (Pa. Super. 2009), and ***Indalex Inc. v. National Union Fire Insurance Co. of Pittsburgh, Pennsylvania***,

83 A.3d 418 (Pa. Super. 2013). In the former three cases, our Supreme Court and this court traced and then refined the boundary around what constitutes an "occurrence" for purposes of determining coverage and indemnity obligations under a CGL policy. However, in *Indalex*, this Court identified a circumstance under which a somewhat different definition of "occurrence" imposed a coverage obligation upon an insurer under factual circumstances bearing some similarity to the circumstances we face in the instant case. Accordingly, we review those cases before taking up the trial court's ruling and the parties' arguments.

At issue in *Kvaerner* was a damaged coke battery built by Kvaerner to specifications provided by Bethlehem Steel Corporation ("Bethlehem"). *See* 908 A.2d at 891. According to Bethlehem, the completed battery was defective. Kvaerner, in turn, alleged that various defects had led to improper movement of the roof of the battery, which, alone or in tandem with a heavy rainfall, resulted in displacement and damage to the furnace. *Id.* at 892-93. Kvaerner sought coverage from National Union based upon its contention that it had not intended its methods or the rainstorms to have caused the movement in the battery's roof. Kvaerner argued that the damage to the battery was the result of an "accident" that was covered by its CGL policies with National Union. *Id.* at 892. The trial court granted National Union summary judgment on the basis that the events described did not constitute an insurable occurrence under the policy. This Court disagreed, and reversed. *See id.* at 893-95.

Our Supreme Court restored the trial court's entry of summary judgment in National Union's favor, providing the following analysis in support of its ruling:

> It is well established that an insurer's duties under an insurance policy are triggered by the language of the complaint against the insured. In **Mutual Benefit Insurance Co. v. Haver**, 725 A.2d 743, 745 (Pa. 1999), we stated:
>
>> A carrier's duty to defend and indemnify an insured in a suit brought by a third party depends upon a determination of whether the third party's complaint triggers coverage.
>
> **Id.** (citing **Gen. Accident Ins. Co. v. Allen**, 692 A.2d 1089, 1095 (Pa. 1997)). This principle has been long held in this Commonwealth as well as in other jurisdictions. In **Wilson v. Maryland Casualty Co.**, 105 A.2d 304, 307 (Pa. 1954), we explained:
>
>> [T]he rule everywhere is that the obligation of a casualty insurance company to defend an action brought against the insured is to be determined *solely* by the allegations of the complaint in the action . . . .
>
> **Id.** (emphasis added).
>
> * * * *
>
> The interpretation of an insurance policy is a question of law that we will review *de novo*. **See 401 Fourth St. V. Investors Ins. Co.**, 879 A.2d 166, 170 (Pa. 2005). Our primary goal in interpreting a policy, as with interpreting any contract, is to ascertain the parties' intentions as manifested by the policy's terms. **Id.** "When the language of the policy is clear and unambiguous, [we must] give effect to that language." **Id.** Alternatively, when a provision in the policy is ambiguous, "the policy is to be construed in favor of the insured to further the contract's prime purpose of indemnification and against the insurer, as the insurer drafts the policy, and controls coverage." **Id.** With these principles in mind, we shall review the terms of the Policies to determine when they required National Union to defend Kvaerner.

- 9 -

The pertinent portions of the National Union CGL policies under which Kvaerner claims coverage state:

COVERAGE A.   BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1. Insuring Agreement

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.   We will have the right and duty to defend any "suit" seeking those damages . . . .

b. This insurance applies to "bodily injury" or "property damage" only if:

(1)   The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory;" . . .

The Policies defined "property damage" as "[p]hysical injury to tangible property, including all resulting loss of use of that property."   An "occurrence" was defined as "an accident, including continuous or repeated exposure to substantially the same or general harmful conditions."

* * * *

Thus, National Union contracted to defend Kvaerner only when a "suit" or "proceeding" was brought against Kvaerner seeking or alleging damages for[,] *inter alia*, property damage [that] is a result of an "occurrence."   An "occurrence," in turn, is an accident.   It is necessary, then, to examine whether the damage that is the impetus of this suit was caused by an accident, so as to constitute an occurrence under the policy.

*Kvaerner*, 908 A.2d at 897 (citations modified or omitted; footnote omitted).

Noting that the policies did not define "accident," the Court used a dictionary to construe "accident" in its "natural, plain, and ordinary sense":

Webster's II New College Dictionary 6 (2001) defines "accident" as "[a]n unexpected and undesirable event," or "something that occurs unexpectedly or unintentionally." The key term in the ordinary definition of "accident" is "unexpected." This implies a degree of fortuity that is not present in a claim for faulty workmanship.

Other courts have reached similar conclusions in the construction of the word 'accident' for the purposes of insurance coverage. In ***Snyder Heating v. Pennsylvania Manufacturers' Association Insurance Co.***, 715 A.2d 483 (Pa. Super. 1998), the insured sought a declaratory judgment that insurer's CGL policy covered alleged liability for a breach of its agreement to maintain burners and boilers at a school's physical plant. The relevant language of the policy was the same as that in this case. ***Id.*** at 485-86. The school allegedly suffered damage to its boilers due to insured's failure to maintain them properly. The court held that there was no coverage under the language of the CGL policy because the complaint set forth solely claims for breach of contract. ***Id.*** at 487. The court explained, "[p]rovisions of a general liability policy provide coverage . . . if the insured work or product *actively malfunctions*, causing injury to an individual or damage to another's property." ***Id.*** (emphasis in original). Contractual claims of poor workmanship did not constitute the active malfunction needed to establish coverage under the policy.

***Id.*** at 897-98 (citations modified; footnote omitted); ***see id.*** at 898 (quoting

***McAllister v. Peerless Ins. Co.***, 474 A.2d 1033, 1036 (N.H. 1984)) ("[T]he

fortuity implied by reference to accident or exposure is not what is

commonly meant by a failure of workmanship." (emphasis and brackets

omitted)).

The Court also cited the South Carolina Supreme Court's decision in ***L-J, Inc., v. Bituminous Fire & Marine Insurance Co.***, 621 S.E.2d 33

(S.C. 2005), for its rejection of coverage for the premature deterioration of a

roadway constructed by the insured: "[A]ll of the allegations raised in the

complaint against L-J, Inc., **including the negligence claims**, were based on faulty workmanship." **Kvaerner**, 908 A.2d at 898 (citing **L-J**, 621 S.E.2d at 36) (emphasis added). The **Kvaerner** Court endorsed the distinction identified in **L-J**:

> [A] CGL policy may provide coverage where faulty workmanship cause[s] bodily injury or damage to another property, **but not in cases where faulty workmanship damages the work product alone**. To permit coverage in such instances would convert CGL policies into performance bonds, which guarantee the work, rather than like an insurance policy, which is intended to insure against accidents.

908 A.2d at 898-99 (emphasis added) (citing **L-J**, 621 S.E.2d at 36-37 & n.4); **see also id.** at 899 (citing additional cases).

Turning to the facts in **Kvaerner**, the Court found that National Union was not obligated to provide coverage. Because Bethlehem's suit against Kvaerner "aver[red] only property damage from poor workmanship to the work product itself," and because faulty workmanship standing alone did not constitute an accident, there had been no covered occurrence. **Id.** at 899.

This Court's first occasion to apply **Kvaerner** under facts similar to those at bar came in **Gambone Brothers**, *supra*. In that case, a number of plaintiffs brought suit against Gambone Brothers, a developer and builder of housing developments. **See** 941 A.2d at 707-08. Each of the plaintiffs had purchased a home in a Gambone Brothers development. Their allegations centered on the use of defective stucco, which caused water damage and related problems. As such, both groups' claims for breach of contract and

warranty, negligence, strict liability, fraud, and UTPCPL violations were founded upon allegations of faulty workmanship.  *Id.* at 708-10.

Gambone Brothers sought coverage from Millers Capital Insurance ("Millers") and were denied.  Millers then sought a declaratory judgment that it did not owe coverage to Gambone Brothers.  The trial court, applying *Kvaerner*, determined that Millers had no coverage obligation to Gambone Brothers.  *Id.* at 709-10.

Before this Court, Gambone Brothers sought to distinguish *Kvaerner* on the basis that the underlying actions did "not merely involve claims for faulty workmanship that led to the failure of the stucco exteriors but also involve[d] claims for ancillary and accidental damage caused by the resulting water leaks to non-defective work inside the home interiors."  *Id.* at 713. This Court rejected the proposed distinction.  Rather than treat interior damage arising from defective workmanship on the exterior of a house as an "occurrence," we recognized the resultant damage as affecting "the interior of the larger product—in this case, the home interiors," *id.*, rendering the facts on all fours with those at issue in *Kvaerner*.

We further elaborated as follows:

> [T]he weight of common sense collapses the distinction Gambone [Brothers] attempts to create.  The *Kvaerner* Court held the terms "occurrence" and "accident" in the CGL policy at issue contemplated a degree of fortuity that does not accompany faulty workmanship.  In reaching this holding, the Court suggested that natural and foreseeable acts, such as rainfall, which tend to exacerbate the damage, effect, or consequences caused *ab initio* by faulty workmanship also cannot be

considered sufficiently fortuitous to constitute an "occurrence" or "accident" for the purposes of an occurrence[-]based CGL policy.

*Id.* (citations omitted or modified). Consequently, we concluded that Millers had no obligation to defend or indemnify Gambone Brothers.

The next time we applied **Kvaerner** in a manner that bears upon the instant case came in **Abbott Furnace**, *supra*. In that case, Erie's insured, Abbott Furnace, manufactured an annealing furnace for another company, IMI, to produce magnetic laminations. When the furnace proved defective, IMI allegedly sustained damages not only to the furnace but also to laminations, including some that had been shipped to IMI customers, resulting in various economic injuries. **See** 972 A.2d at 1234-35. IMI filed suit in federal court. Abbott Furnace sought coverage under its CGL policy, which Erie denied. The federal litigation resulted in a settlement pursuant to which Abbott Furnace agreed to pay IMI $450,000. Abbott Furnace alleged that it had incurred legal fees of nearly $800,000.

Erie then filed a declaratory judgment action against Abbott Furnace. *Id.* at 1235. Therein, Erie alleged that IMI's pleadings did not establish an occurrence that would trigger coverage, and that coverage also was barred by certain policy exclusions. Abbott Furnace answered and counterclaimed for declaratory judgment, contending that IMI had, in fact, pleaded an occurrence. Relying upon **Kvaerner**, the trial court granted Erie's motion for summary judgment, and Abbott Furnace appealed. *Id.* at 1236. Among the issues Abbott Furnace raised before this Court was the following:

Whether the trial court erred in entering summary judgment in favor of [Erie] and holding that [Erie] had no duty to defend or indemnify [Abbott Furnace] in the lawsuit filed by [IMI] . . . where IMI's complaint included allegations that an annealing furnace manufactured by [Abbott Furnace] actively malfunctioned and caused physical damage to, *inter alia*, IMI's tangible personal property other than the annealing furnace itself.

*Id.*

We began by considering Abbott Furnace's claim that, because IMI's complaint asserted negligence as well as faulty workmanship and damages to property other than the annealing furnace itself, the case was distinguishable from **Kvaerner** and coverage was due. Reviewing IMI's complaint, we found it consistent on its face with Abbott Furnace's averments. However, we noted that, "[w]hen a plaintiff alleges that a defendant committed a tort in the course of carrying out a contractual agreement, Pennsylvania courts examine the claim and determine whether the 'gist' or gravamen of it sounds in contract or tort." **Id.** at 1238 (citing **Penna. Mfrs.' Ass'n Ins. Co. v. L.B. Smith, Inc.**, 831 A.2d 1178, 1182 (Pa. Super. 2003)). "As a practical matter," we explained, "the doctrine precludes plaintiffs from recasting ordinary breach of contract claims into tort claims." **Id.**

We then found that the gist of IMI's action against Abbott Furnace lay in contract:

Although IMI did reference [Abbott Furnace's] negligence in Count VI of its second amended complaint, we find, as did the trial court, that a negligence claim was not adequately pleaded in this instance. IMI's claim that [Abbott Furnace] had a duty to

- 15 -

apprise IMI of the design defects experienced by IMI's competitor or, at least, had a duty to not design the furnace in the identical or similarly defective manner arose from the mutual agreement between the parties regarding the specific requested purpose and design of the furnace. Specifically, before ordering a furnace from [Abbott Furnace], IMI advised [Abbott Furnace] of its specific needs and intended use. **The damage to IMI's laminations resulted from [Abbott Furnace's] contractual breach in failing to design the furnace in accordance with IMI's requested needs and intended use.** This is not a situation in which the tortious conduct was the "gist" of the action and the contract was merely collateral to the conduct. Accordingly, the claim should be limited to a contract claim . . .

*Id.* at 1239 (emphasis added; citations omitted). On that basis, we affirmed the trial court's grant of summary judgment to Erie.

We further developed our post-***Kvaerner*** "occurrence" jurisprudence in ***Indalex***. In that case, the underlying claims involved allegations that the appellant manufactured defective windows that resulted in water leakage and attendant damage, including mold, as well as personal injury. The insurer, National Union, denied coverage on the basis that there was no occurrence as that term was used in the policy. Relying upon ***Kvaerner***, the trial court granted summary judgment to National Union. ***See*** 83 A.3d at 419-20. Indalex appealed.

After providing the now-familiar account of ***Kvaerner***, we called attention to another aspect of the Supreme Court's decision in that case:

The Court further supported its holding . . . by quoting from a law review article by Roger C. Henderson, as follows:

The risk intended to be insured [by CGL policies] is the possibility that the goods, products or work of the insured, once relinquished and completed, will cause bodily injury or damage to property other than to the completed work

- 16 -

> itself and for which the insured by [may] be found liable. The insured, as a source of goods or services, may be liable as a matter of contract law to make good on products or work which is defective or otherwise unsuitable because it is lacking in some capacity. This may even extend to an obligation to completely replace or rebuild the deficient work or product. This liability, however, is not what the coverages in question are designed to protect against. **The coverage is for tort liability for physical damages to others and not for contractual liability** of the insured for economic loss because the product or completed work is not that for which the damaged person bargained.
>
> *Insurance Protection for Products Liability and Completed Operations; What Every Lawyer Should Know*, 50 Neb. L. Rev. 415, 441 (1971).
>
> *Kvaerner*, 908 A.2d at 899 n.10 (emphasis added). Thus, the *Kvaerner* Court's decision was also based on the fact that the underlying complaint contained only claims for breach of contract and breach of warranty.

*Indalex*, 83 A.3d at 422-23 (citations modified). This Court then went on to observe that the same was true of the claims asserted in *Gambone Brothers*. *Id.* at 423.

Turning then to this Court's decision in *Abbott*, we acknowledged that, in that case, unlike in *Kvaerner* and *Gambone Brothers*, the underlying complaint sought compensation for damages to property other than that which was faulty. However, we noted that our decision in *Abbott* focused upon the inadequacy of the pleadings to **establish** a claim for negligence, which compelled this Court in *Abbott* to find that the claims more properly lay in breach of contract. That is to say, in *Indalex*, we interpreted *Abbott* not as categorically precluding coverage for negligence claims arising from

damages caused by a faulty product or faulty workmanship to property other than the work or product alleged to have caused the damages, even with respect to a contractual counterparty, but rather as having found the underlying complaint insufficient to warrant recognizing the claim as something more than a contract claim in tort's clothing—*i.e.*, that the gist of the action, under those particular facts, was contract-based. We concluded that **Indalex** was distinguishable from **Kvaerner**, **Gambone Brothers**, and **Abbott**: "As acknowledged by the trial court in this case, the **Kvaerner** holding was limited to situations 'where the underlying claims were for breach of contract and breach of warranty, and the only damages were to the [insured's] work product.'" **Indalex**, 83 A.3d at 424 (citation omitted).

We also added the following reasoning:

[T]he policy at issue here includes in the definition of occurrence the subjective language "[a]s respects Bodily Injury or Property Damage, an accident, including continuous or repeated exposure to conditions, which results in Bodily Injury or Property Damage neither **expected nor intended from the standpoint of the Insured**." Commercial Umbrella Policy, at ¶ H(1) (emphasis added). However, the policy at issue in **Kvaerner** contained no such subjective definition. **See Kvaerner**, 908 A.2d at 897 (stating that the policy defined occurrence as "an accident, including continuous or repeated exposure to substantially the same or general harmful conditions"). Moreover, Appellee points out in its brief that the trial court stated "the key term in the ordinary definition of 'accident' is 'unexpected.'" The policy at issue provides that it is the insured's subjective viewpoint, and damages such as mold[-]related health issues were arguably not expected.

\* \* \* \*

Construing the policy in a manner that gives effect to all of its language, we conclude that Appellee is obligated to defend

- 18 -

Appellants. Simply stated, because Appellants set forth tort claims based on damages to persons or property[] other than the insured's product, we cannot conclude that the claims are outside the scope of the coverage.

*Id.* at 424-25 (citations modified or omitted).

Having established this doctrinal background, we may turn to Appellants' arguments in the instant matter. In support of their first issue, concerning the existence of an insurable occurrence under Garnishee's policy, Appellants set forth a number of bases upon which to distinguish *Kvaerner* and *Gambone Brothers* and analogize this case to *Indalex*. In particular, Appellants focus upon the distinction between damages to the product alleged to be faulty and damages to other property or personal injury that appeared to be material to the *Kvaerner* and *Gambone Brothers* rulings. Brief for Appellants at 13-15.

Appellants assert an additional contractual basis upon which to distinguish this case from *Kvaerner* and *Gambone Brothers*: The **absence** of any contract between Appellants and Penn Framing precluded Appellants from seeking to recover from Penn Framing via contract claims. Thus, Appellants' only recourse against Penn Framing lay in negligence, precluding a finding that the gist of their action lies in contract. *Id.* at 16-17.

Finally, Appellants contend that, were we to find that *Kvaerner* is controlling in this case, we would set bad policy:

There is an occurrence in this matter because the loss to the Appellants is damage caused to property owned by Appellants

other than the work Penn Framing performed framing Appellants' home and installing the windows . . . . That damage is fortuitous even if the loss to Penn Framing's work is not—the damage to the furniture, window coverings, stucco, insulation and drywall and other personal property of Appellants represented by the judgment is accidental. From the perspective of . . . Appellants, had the framing been performed improperly and an actual window fell on someone, that would have been a covered loss to a person[;] leaking [that] causes property damage to something other than the work performed by Penn Framing would likewise be within the reasonable expectations of coverage.

[Garnishee's] extension of this interpretation of "occurrence" would have dangerous and unsettling consequences. For example, if a subcontractor improperly installed a gas heater which subsequently exploded—would there be no coverage for either loss of life or personal property from the resulting explosion under a CGL policy because there was no "occurrence"? Would a subcontractor hired to build a private damn [*sic*] on a property not be held liable for personal property damage resulting from a dam[] breach? . . . Such results would be absurd and clearly not contemplated by ***Kvaerner***.

*Id.* at 18-19.

Garnishee argues that ***Kvaerner***'s rationale sweeps more broadly than just those circumstances where the plaintiff has a contractual relationship with the defendant-insured: Whether there is an underlying contract or not, no coverage will lie for a claim arising out of a claim of faulty workmanship. ***See*** Brief for Garnishee at 13-14. Based upon that premise, Garnishee then endeavors to analogize this case to ***Gambone Brothers***, an analogy that undisputedly gains strength if the lack of a contract between Appellants and Penn Framing is immaterial, as Garnishee suggests that it is. Garnishee also reviews a number of cases that do not bind this Court, including non-

precedential memoranda decisions by this Court and federal cases, that rejected the distinction that Appellants would have us draw between *Gambone Brothers* and the instant matter. *Id.* at 18 (discussing *Specialty Surfaces Int'l v. Continental Cas. Co.*, 609 F.3d 223 (3d Cir. 2010); *Westfield Ins. Co. v. Belleveue Holding Co.*, 856 F. Supp.2d 683 (E.D.Pa. 2012); *Mid-Continent Ins. Co. v. Neves Constr., Inc.*, 3313 EDA 2010 (Pa. Super. July 8, 2011) (unpublished); *Certain Underwriters at Lloyd's London v. Berzin*, 1728 EDA 2010 (Pa. Super. April 5, 2011) (unpublished)). Specifically, Garnishee maintains that each of those cases interpreted *Kvaerner*'s and *Gambone Brothers*' holdings as hinging not upon privity of contract or the distinction between damages to the allegedly unworkmanlike work itself, but rather upon the definition of "accident," as utilized in the definitions of occurrence in the policies at issue, which definitions were materially identical to each other and to the definition at issue in this case:

> [T]he issue is not whether the claim is described as contractual or tortious, as selected by a plaintiff. Rather, the key point concerns whether the claim is based on defective workmanship. As the Supreme Court stated in *Kvaerner*, 908 A.2d at 899, "the definition of 'accident' required to salvage an 'occurrence' under the policy cannot be satisfied by claims based upon faulty workmanship." Likewise, the Pennsylvania Superior Court in *Gambone Brothers*, 941 A.2d at 718, stated that "'occurrence' refers to [an] 'accidental' phenomenon—not claims predicated on allegations of faulty workmanship." [Appellants'] attempt to create an illusory distinction in this regard has no basis and should be disregarded.

Brief for Garnishee at 21.

Garnishee also rejects Appellants' reliance on **Indalex**. Brief for Garnishee at 22-28. First, Garnishee notes the distinct definition of "occurrence" in **Indalex**, which differed relative to the foregoing cases. While occurrence is defined by the policy at issue in this case as "[a]n accident, including continuous or repeated exposure to substantially the same general harmful conditions," the policy in **Indalex** defined occurrence as follows: "As respects bodily injury or property damage, an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." Brief for Garnishee at 25 (quoting **Indalex**, 83 A.3d at 424-25). Garnishee notes that this Court observed that this introduced a subjective element to the definition that is absent from the instant, more conventional definition of occurrence, which contains no such language, and contends that we found that distinction dispositive in distinguishing **Indalex** from **Kvaerner**. **Id.** at 25-26. Finally, Garnishee notes that **Indalex** took the form of a defective product claim, which this Court characterized as a claim involving "an 'active malfunction,' and not merely bad workmanship." **Id.** at 26 (quoting **Indalex**, 83 A.3d at 424); **see Kvaerner**, 908 A.2d at 898 (citing **Snyder Heating** for the proposition that "[c]ontractual claims of poor workmanship did not constitute the active malfunction needed to establish coverage under the policy").

**Kvaerner**, **Gambone Brothers**, and **Abbott** appear to have left open the door to a finding of an occurrence where unworkmanlike construction

causes damage to property other than the work itself, and we discern no binding precedent that conclusively rejects this possibility.[6] However, the United States Court of Appeals for the Third Circuit at least twice has cited **Kvaerner** and **Gambone Brothers** as foreclosing that possibility when the underlying allegations arise from faulty workmanship. In **Nationwide Mutual Insurance Co. v. CPB International, Inc.**, 562 F.3d 591 (3d Cir. 2009), a case with a fact pattern materially identical to **Gambone Brothers**, the court of appeals held as follows:

> In **Gambone Brothers**, the insured was a housing developer, and the plaintiffs in the underlying action alleged that faulty construction resulted in severe leaking [that] damaged the interior of their homes. 941 A.2d at 713. The insured conceded that "**Kvaerner** stands for the broad principle that an insurance claim under an occurrence[-]based CGL policy that defines the 'occurrence' as an accident cannot be premised on a claim of faulty workmanship," **id.** at 713, but contended that the underlying action "involve[d] claims for ancillary and accidental damages caused by the resulting water leaks to . . . the home interiors," and that those claims alleged an 'occurrence' even though the damage to the" home exterior did not. **Id.** The Superior Court did "not see any merit in the distinction [the insured] attempt[ed] to create." **Id.** Instead, the Superior Court interpreted the **Kvaerner** decision as stating that "natural

---

[6]     In this regard, Garnishee's attempt to analogize this case to our determination in **Gambone Brothers** that the claims involved damage to the product at issue, *i.e.*, the house taken as a whole, and hence were fully remediable in a contract action, is infirm. Here, the house is Falcone's product; Penn Framing's product is the framing, windows, and perhaps other portions of the house, but undisputedly less than the house as a whole. Hence, any damage to parts of the house unrelated to framing, windows, and any other work performed by Penn Framing, is damage to Appellants' personalty.

and foreseeable acts . . . which tend to exacerbate the damage, effect, or consequences caused *ab initio* by faulty workmanship also cannot be considered sufficiently fortuitous to constitute an 'occurrence' or 'accident' for the purposes of an occurrence based CGL policy." **Id.**

***Nationwide Mut.***, 562 F.3d at 597 (citations modified). However, in ***Nationwide Mutual***, it is not clear that any of the plaintiffs sought to recover for more than the damage to the homes that were caused by the builder's allegedly unworkmanlike construction.

In ***Specialty Surfaces***, *supra*, the court of appeals read ***Gambone Brothers*** equally expansively. In that case, the insured was sued for damages associated with its work installing portions of a playing surface at an athletic facility. In no uncertain terms, the claimants sought damages for consequential damages to property other than the property that the insured had installed. Once again, though, the court of appeals read ***Gambone Brothers*** to preclude coverage, in effect predicting that our Supreme Court would do the same when presented with that precise question:

> The insured insists that **Gambone Brothers** is distinguishable from [the instant] case because the plaintiffs there did not allege damage beyond the structure of the house, which was the work product of the insured. This argument, however, ignores that the **Gambone Brothers** court, following **Kvaerner**, clearly focused on whether the alleged damage was caused by an accident or unexpected event, **or was a foreseeable result of the faulty workmanship**[,] when deciding whether the policy covered the damage. Here, water damage to the subgrade[, which was not installed by the insured,] was a foreseeable result of the failure [of the insured] to supply a suitable liner or to ensure the proper manufacture and installation of the synthetic turf and subdrain system.

- 24 -

609 F.3d at 239 (nomenclature modified; emphasis added). If we adopt *Specialty Surfaces*' analysis, we must affirm the trial court's ruling. In that case, as in the matter *sub judice*, the issue was water damage to personalty caused by a failure of workmanship in a separate product.

The only case that arguably provides Appellants safe harbor from *Kvaerner* and *Gambone Brothers*, and might lead us to depart from the sound reasoning of the court of appeals in *Nationwide Mutual* and *Specialty Surfaces*, is *Indalex*. However, we do not agree with Garnishee that *Indalex* hinged upon the element of subjectivity in the underlying policy's definition of occurrence. Although we nominally rejected the proposition that the language of the definition in *Indalex* was materially identical to the definition at issue in *Kvaerner*, 83 A.3d at 424, we also cited approvingly the appellee's observation that "the key term in the ordinary definition of 'accident' is 'unexpected.'" *Id.* at 425. These propositions are difficult to reconcile, inasmuch as the phrasing that introduced what we identified as a subjective element to the policy language, "neither expected nor intended from the standpoint of the [i]nsured," coincided with what we acknowledged in the same breath is inherent in the definition of accident, *i.e.*, "unexpected." In any event, the most critical element in *Indalex* was that the appellant's claims were product-liability/tort claims that were "based on damages to persons or property, other than the insured's product." *Id.* Such claims are absent here, where workmanship is at issue,

rather than an active malfunction or product liability, as such. Hence, **Indalex** cannot carry the day for Appellants.

We conclude that the Third Circuit decision in **Specialty Surfaces** aptly analyzed **Kvaerner** and progeny. Simply put, it is foreseeable that a failure of workmanship that leaves a house's envelope compromised and, therefore, vulnerable to water penetration, may be damaged thereby. It further is foreseeable that water penetration may damage the home as well as property, and even people, contained within it.[7] Thus, Appellants' judgment against Penn Framing was not covered by Garnishee's policy, and Appellants may not recover from Garnishee.

This leaves us to address Appellants' second issue, which concerns Appellants' contention that Garnishee owed Penn Framing coverage, if not

---

[7] Although Appellants pleaded personal injury as well as property damages, before this Court, Appellants do not argue that the judgment entered against Penn Framing, or the damages associated therewith, arose due to personal injury. **See** Brief for Appellants at 21 (distinguishing **Indalex**: "The only difference in the case *sub judice* is that there is no allegation of personal injury."). In another case, a distinction between property damage and personal injury might warrant separate analyses of foreseeability as to each. While leakage arising from a poorly installed window plainly is foreseeable, at least one Pennsylvania court has found that personal injury arising from the growth of mold arising from such a leak is not. **See, e.g., Crumm v. K. Murphy & Co. Inc.**, 10 Pa. D. & C.5th 268, 280 (Lancaster Cty. C.C.P. 2009) ("Damages for personal injuries arising from an alleged exposure to toxic mold are not such that would naturally and ordinarily arise from a breach of contract to construct a home nor is there any evidence that these damages were reasonably foreseeable and within the contemplation of the parties at the time the contract was formed."). We need not address that question in the instant case.

directly under its bodily injury and property damage provision, then under its Products/Completed Operations coverage. The trial court rejected this argument on the basis that Appellants had failed to establish the existence of such coverage under the policy "in law and in fact," but further noted that, even had they done so, Garnishee still would not owe coverage because such coverage depends upon the existence of an occurrence as defined in the policy.

Appellants assert that such coverage exists because it is referred to in the declarations page of the policy and defined elsewhere in the policy. Brief for Appellants at 21-22. Notably, Garnishee does not dispute the existence of such coverage. Brief for Garnishee at 29 ("[Garnishee] has never contested that such coverage exists . . . .").

Both parties cite *Friestad v. Travelers Indemnity Co.*, 393 A.2d 1212 (Pa. Super. 1978), to explain the purpose of such coverage:

> "Completed Operations" supplements "premises-operations" and refers to injuries or losses which arise after a jobsite has been returned to the control of the premises' owner. The "Products Hazard" also requires the insured's relinquishment of control of a product, coupled with an injury or loss away from the normal business premises. The principal thrust of completed operations is the insured's provision of a service, while the principal thrust of the products hazard is the insured's manufacture or sale of a product.

*Friestad v. Travelers Indem. Co.*, 393 A.2d 1212, 1213 n.2 (Pa. Super. 1978).

Under the CGL policy *sub judice*, "products-completed operations hazard" is defined in relevant part as follows:

> a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:
>
> 1) Products that are still in your physical possession; or
>
> 2) Work that has not yet been completed or abandoned.

Commercial General Liability Form at 11-12 ¶ V.16.

Aside from a rehash of their claims regarding their lack of contractual relationship with Penn Framing, the relevance of which to this issue is unclear, Appellants' argument consists entirely of the following bald assertions:

> By paying a premium for Products/Completed Operations coverage, Penn Framing expressly desired coverage for at least one claim that was raised by [Appellants] in the underlying matter, to wit, the leaking around the windows caused damage to Appellants' furniture and structures and materials in the home [that] were not installed by Penn Framing. By accepting the premium payments, [Garnishee] agreed to provide a defense of such claims and indemnity for such claims proven [*sic*]. Instead [Garnishee] knowingly abandoned its insured, Penn Framing, in the underlying matter when it had actual notice of the claims and cannot argue that there is no coverage now.
>
> * * * *
>
> The type of loss contemplated by Products/Completed Operations coverage occurred here—after Penn Framing finished its job on [Appellants'] home, its work/product caused damage to [Appellants'] personal property . . ., where it performed its work/installed its product. To hold otherwise would make this entire coverage illusory.

Brief for Appellants at 23-24.

- 28 -

The problems with this claim arise from the paucity of legal argument and the lack of citations of relevant case law and documents. ***See*** Pa.R.A.P. 2119(a)-(c). Appellants advert to the definition of "completed operations" in the policy, as set forth above, but make no effort to explain why this definition—which is in definitional section V, and set off from the separate section I concerning coverages—warrants coverage where the policy's general coverage for bodily injury and property damage, which **is** found in the coverages section, does not.

In any event, Appellants have no material argument that such alternative coverage (if it even is, in fact, alternative coverage under the circumstances presented) is excluded from the necessity that the events triggering coverage constitute an occurrence as defined in the policy. Absent a winning argument on that point, we must conclude that any such coverage in this occurrence-based policy is precluded for the same reasons set forth, *supra*, in our rejection of Appellants' first issue. Accordingly, Appellants' second issue, too, must fail.

Judgment affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>12/23/2014</u>